UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>v.<br><br>MANUEL PHILLIP VILLALOBOS,<br><br>     Defendant. | Case No. 3:19-cr-00040-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is the Government's Motion for a *Sell* Hearing, which argues that Defendant Manuel Phillip Villalobos should be forcibly medicated. Dkt. 59. On January 27, 2022, the Court held oral argument and took the motion under advisement. Upon review, and for the reasons set forth below, the Court GRANTS the Motion.

## II. BACKGROUND

### A. Factual Background

Manuel Phillip Villalobos, III, is charged in a Second Superseding Indictment with one count of unlawful possession of a firearm, four counts of assault upon a federal officer, four counts of use of a firearm during and in relation to a crime of violence, and one count of possession of an unregistered firearm. Dkt. 28. The charges are based on Villalobos' actions during a February 7, 2019 service of a warrant on his Idaho residence.

MEMORANDUM DECISION AND ORDER - 1

After agents from the FBI SWAT team approached Villalobos' home and announced their presence, Villalobos fired several times at agents as they attempted to breach the back door. Multiple agents were standing at the door when Villalobos opened fire, and one agent was injured. The SWAT team did not return fire, and Villalobos ultimately surrendered.

**B.  Procedural Background**

In early 2020, defense counsel hired a Clinical and Forensic Psychologist to conduct a competency evaluation of Villalobos. Since then, four psychiatric reports have been prepared regarding Villalobos's mental state. The first is a Forensic Psychological Evaluation from February 19, 2020, written by Dr. Karen Franklin, the Psychologist retained by the defense (the "Franklin Report"). Dkt. 41. The second is a Forensic Evaluation prepared by Dr. Ryan Nybo, the Forensic Unit Psychologist for the Federal Detention Center at SeaTac, Washington ("FDC SeaTac") (the "SeaTac Report"). Dkt. 49. The third is a Forensic Evaluation prepared on September 20, 2021, by Marissa Abrams, M.A., Psychology Intern, who was supervised by Dr. Kristina P. Lloyd, Psy.D., ABPP, a Forensic Psychologist at the Federal Medical Center, Butner (the "FMC Butner Report"). Dkt. 57. A fourth report, the FMC Butner Addendum ("Addendum") was prepared by Dr. Charles A. Cloutier in December of 2021. Dkts. 66, 69.

In her report, Dr. Franklin explains she conducted a five-and-a-half-hour clinical evaluation of Villalobos on January 17, 2020. Dkt. 41, at 2. In addition, she "reviewed several thousand pages of Bates-stamped discovery documents as well as audiotapes, videotapes and still photographs." *Id*. Dr. Franklin also reviewed Villalobos' public Facebook account and "conducted collateral interviews with his mother and older sister."

*Id.* Dr. Franklin diagnosed Villalobos with a delusional disorder, mixed type. *Id*. at 13. Dr. Franklin concluded that because of his delusions and his upbringing, Villalobos is not currently competent to stand trial.

Specifically, with respect to his delusions, Dr. Franklin wrote that "Mr. Villalobos was preoccupied with a delusional belief system involving an organized plot to murder him and his family. The primary goal of the conspirators was to remove him from his home in order to extract gold from the land. The conspirators were leaching gold from the soil, and were intent on destroying the fish habitat so the river could be mined for gold." Dkt. 41, at 9. Villalobos's "observations" used as evidence to support his theory included, *inter alia*, the facts that "a pipe ran from his hot water tank into the ground"; "he spotted tribe members and white neighbors talking to each other"; and "the porta-johns were being swapped out frequently, suggesting they were being used to transport gold off the site." *Id.* Dr. Franklin concluded Villalobos's upbringing also contributed to his paranoid delusions. For instance, Villalobos's father was a Vietnam War vet who raised Villalobos in a paramilitary environment; he taught Villalobos how to disarm explosive devices and how to respond if enemy came "over the wire." Dkt. 41, at 3.

Because of his disorder, Dr. Franklin concluded that Villalobos lacked the capacity to understand the nature and consequences of the proceedings against him, or to assist properly in his defense. *Id*. Dr. Franklin also wrote that Villalobos' "attorney-client communications are dominated by his attempts to convince his attorney of the importance of these delusionally based issues." *Id*. at 18.

Based on Dr. Franklin's finding of incompetence, Villalobos filed a motion under

18 U.S.C. §4241(a), requesting a hearing to determine his competency to stand trial. Dkt. 40. In response to Villalobos' motion, the Court ordered a mental competency evaluation pursuant to 18 U.S.C. §§ 4241 and 4247, and committed Villalobos to the custody of the Attorney General for placement at a federal facility suited for that purpose. Dkt. 45. Dr. Ryan Nybo, a psychiatrist at the Federal Detention Center at SeaTac, Washington, evaluated Villalobos as requested by the Court. Dkt. 49. Similarly to Dr. Franklin, Dr. Nybo diagnosed Villalobos with delusional disorder, persecutory type. *Id*. at 13. Dr. Nybo also diagnosed Villalobos with severe cannabis use disorder, in a control environment. *Id.* Although Villalobos understood certain aspects of his criminal charges and the attendant court proceedings, Dr. Nybo concluded that Villalobos' delusional disorder substantially impairs his "ability to understand the nature and consequences of the court proceedings," and impaired his ability to assist in his defense. *Id*. at 16. Dr. Nybo recommended that Villalobos participate in formal competency restoration procedures at a Federal Medical Center. *Id*. at 17.

The Court held a competency hearing on October 5, 2020. Dkt. 51. Based on the findings of Dr. Franklin and Dr. Nybo, the Court found Villalobos was suffering from a mental disease and was not competent to stand trial. Dkt. 52. The Court committed Villalobos to the custody of the Attorney General for the purpose of undergoing restorative treatment pursuant to 18 U.S.C. § 4241. *Id*.

On September 20, 2021, in the FMC Butner Report, the Federal Medical Center in Butner, North Carolina ("FMC Butner") reported that although psychiatric professionals had determined Villalobos could be restored to competency through the administration of

anti-psychotic medication, he refused to voluntarily accept such medication. Dkt. 57, at 13. The FMC Butner report was prepared by Marissa Abrams, M.A., Psychology Intern, and Dr. Kristina P. Lloyd, Psy.D., ABPP, Forensic Psychologist.[1] The FMC Butner report contains a detailed description of Villalobos' personal history and development.

The FMC Butner Report agrees with the prior two reports and concludes that Villalobos has (1) Delusional Disorder, persecutory type, and (2) Cannabis use disorder, moderate, in remission, in a controlled environment. FMC Butner concluded that while Villalobos is not currently competent to proceed to trial, "a substantial probability exists that Mr. Villalobos' competency to stand trial can be restored with appropriate treatment with antipsychotic medicine." Dkt. 57, at 12. FMC Butner also concluded that "less intrusive methods of treatment, such as psychotherapy, are not likely to restore his competence." *Id*. However, Villalobos has refused to accept recommended medication. *Id*.

FMC Butner concluded that Villalobos is not dangerous to himself, or to others, in his current conditions of confinement, nor is he gravely disabled. *Id*. FMC Butner explained that "Villalobos has been free from aggressive or self-destructive behavior since his arrival at FMC Butner. He has been continuously housed in an open population mental health unit since his arrival . . . without engaging in behavior that would pose a high risk of danger to himself or others." *Id*. FMC Butner also stated that "it does not appear Mr.

---

[1] The FMC Butner Report is very thorough. The staff at FMC Butner conducted a "History and Physical Examination," observed Villalobos's behavior, and conducted multiple clinical interviews. Dkt. 57, at 2. In addition, the physicians reviewed: the legal materials from Villalobos' case, including the Franklin Report and the Nybo Report; the medical records stored by the Bureau of Prisons; and thirty-eight collateral materials, including interviews, warrants, emails, evidence logs, FBI reports, the Nez Tribal Police Report, other police records, and various Facebook postings attributed to Villalobos.

Villalobos meets criteria for [civil] commitment under section 4246." *Id*. at 13.

Based on Villalobos' refusal to voluntarily receive treatment, the Government requested that the Court conduct a *Sell* hearing to determine if Villalobos should be compelled to receive medication and argued that he should be so compelled. Dkt. 59. The Court consequently scheduled an evidentiary hearing to determine whether Villalobos should be compelled to receive medication. Dkt. 61. Prior to the *Sell* hearing, the Court ordered FMC Butner to submit an Addendum to the Forensic Evaluation, outlining in detail its proposed treatment plan and any further details pertinent to the *Sell* factors. Dkt. 62. The Addendum was received by the Court and filed twice (Dkts. 66, 69).[2]

The Addendum, prepared by Dr. Cloutier, contained several important findings. FMC Butner reaffirmed its belief that Villalobos has Delusional Disorder, Persecutory Type, Continuous, and noted Villalobos has not previously been treated with antipsychotic medication. The Addendum specified that FMC Butner recommends treating Villalobos with **risperidone**. If the Court orders such treatment, Villalobos would be given 1 mg daily, with the dose gradually increased over time, by 1 mg increments in 1-2-week intervals, to a maintenance dose somewhere between 3-6 mg. If Villalobos refuses oral risperidone, FMC Butner would administer injections of **haloperidol**, a different antipsychotic medicine. FMC Butner explained that haloperidol injections would be used:

> [b]ecause there is no immediate-acting injectable form of Risperidone and, thus, no way to provide a test-dose of Risperidone before starting long-acting Risperidone (biweekly injections). If he were to develop an allergy, it would take some 2-3 weeks for the Risperidone injection to clear his system, versus hours for the oral formulation.

---

[2] The two Addendums appear to be identical.

> For Mr. Villalobos, the Haloperidol would be started with a one-time intramuscular (IM) injection of the immediate-acting formulation, Haloperidole Lactate at a low dose of 2mg. If he tolerates that dose with no evidence of allergic reaction, then the long-acting version would be started at a low dose of 25 mg IM every 2 weeks. After an additionally one or two biweekly injections, and based on clinical response, the dose could be maintained at the ame dose of 25 mg every 2 weeks (or 50 mg every 4 weeks to minimize number of injections) or increased monthly by 25 mg increments based on clinical response.

Dkt. 73, at 2–3. FMC Butner also recommended adjunctive treatment (anticholinergic, benzodiazepines, or mood stabilizers), as needed, to manage side effects or improve treatment response.

FMC Butner explained that Villalobos' delusional mental illness is "very likely to respond to antipsychotic medication," and that 70–80% of patients are able to attain competency with antipsychotic medication. Dkt. 69, at 3. FMC Butner clearly stated that it expects a "decrease in his symptoms of mental illness and an increase in functioning." *Id*. The published studies on antipsychotic medications repeatedly demonstrate the effectiveness of antipsychotic medication, and it "is considered an essential element on the treatment of these conditions." *Id*. at 8.

There are risks to taking antipsychotic medications, such as risperidone and haloperidol. FMC Butner noted "the most probable and concerning would be neuromuscular side effects, including extrapyramidal symptoms (EPS; mild shaking or tremor, or brief episodes of muscle tightness or spasm [dystonia])." *Id*. at 3. However, with risperidone and similar medications, "those side effects are relatively less common and less severe." *Id*. There is "a very low risk of serious side effects", and there is an "extremely

low risk of sudden cardiac death," especially when compared to the older generation of antipsychotic medications. *Id*. FMC Butner also stated that such risks would be mitigated by starting at a low dosage, with an only gradual increase after carefully observing and evaluating Villalobos. FMC Butner also plans to promptly respond to any side effects that arise. FMC Butner summed up its recommendation as follows:

> Administration of involuntary antipsychotic medication to Mr. Villalobos is substantially likely to render him competent to stand trial and is substantially unlikely to interfere with his ability to assist his counsel; that less intrusive treatments are very unlikely to achieve the same results; and that it is clinically appropriate and indicated to treat his psychotic illness with antipsychotic medication.

*Id*. at 4.

FMC Butner opined that a less intrusive method to compel administration of a drug, such as a court order, would likely prove fruitless. FMC Butner stated that "there is no compelling evidence that an incompetent defendant would understand the implications of a contempt order as a basis for making a rational decision on whether or not to comply with the order." *Id*. at 14. FMC Butner explained it has had three previous situations in which a non-dangerous incompetent pretrial detainee was ordered to take drugs by a court using its contempt power. *Id*. at 15. In one of those cases the defendant voluntarily accepted the medication. *Id*. In the other two, the defendants chose not to take the medicine and did not understand the consequences of choosing to not do so, which led to significant delays in the trial proceedings. *Id*.

The appendix to the Addendum contained various studies regarding the success rate of antipsychotic medication in restoring defendants to competency. One of them, a 2012

study, detailed the various success rates for such medication.

> An article by Cochrane et al. (2012) reviewed treatment outcome of all defendants involuntarily treated under the *Sell* criteria for the entire United States federal court system. A total of 132 individuals with various psychotic diagnoses had undergone involuntary treatment with antipsychotic medication, with the majority (79%) improving sufficiently to be restored to competency status. In defendants diagnosed with schizophrenia, 62 of 81 defendants (approximately 76%) were restored to competency status with involuntary treatment. In patients diagnosed with schizoaffective disorder, 18 of 22 (81.8%) were restored to competency status. *In patients with delusional disorder, 11 of 15 (73.3%) were restored*.

*Id*. at 7 (emphasis added). Notably, less patients with delusional disorder have been treated than have defendants with schizophrenia. However, despite the smaller sample size, the success rate of medication for individuals with delusional disorder has mirrored the high success rate of medication for patients with other psychotic disorders.

FMC Butner also explained that "the effectiveness of antipsychotic medication in treating schizophrenia and related psychotic disorders has been repeatedly demonstrated in published professional literature for nearly 50 years and is considered an essential element in the treatment of these conditions." *Id*. at 8. FMC Butner emphasized that psychotherapy is used best as an "*adjunctive* treatment" for patients with psychotic disorders, not as the main treatment. *Id*. at 7 (emphasis in original).

Some of the possible (although not necessarily attendant) side effects for antipsychotic medications are weight gain, emergence/worsening of diabetes, and high cholesterol. *Id*. at 9. FMC Butner explained that it monitors for these conditions but in addition to such monitoring, it also regularly gives healthy lifestyle coaching, offers multiple options for recreation choices, and provides patients with access to healthy meals

that accommodate their dietary needs. *Id*. FMC Butner wrote that for some patients receiving antipsychotic medications, the lifestyle modification often prevents, minimizes, or reverses the weight gain, diabetes, and/or high cholesterol. *Id*. at 10.

There is a low risk of more serious side effects for antipsychotic treatment. One such risk is neuroleptic malignant syndrome.[3] However, this only happens in 0.01%–0.02% of individuals who receive antipsychotic medications. Another such risk is sudden death, "presumably from cardiac arrhythmias." *Id*. Although clearly catastrophic, the risk of death is extremely low. "Analysis of large patient databases indicates the risk of sudden death in the general adult population is approximately seven to fourteen events per 10,000 person-years, compared to ten to twenty-nine events per 10,000 person-years in populations treated with antipsychotic medication."[4] *Id*.

During the *Sell* hearing on January 27, 2022, the Government offered two

---

[3] FMC Butner defines neuroleptic malignant syndrome as "a potentially life-threatening complication of antipsychotic treatment. The symptoms may include muscular rigidity, dystonia, high fever, increased blood pressure, increased heart rate, akinesia, mutism, and obtundation." Dkt. 69, at 10.

[4] A "person-year" refers to the amount of time that all the individuals in a database were studied. Division of Scientific Education and Professional Development, *Lesson 3: Measures of Risk*, Principles of Epidemiology in Public Health Practice, Third Edition
An Introduction to Applied Epidemiology and Biostatistics, Section 2 (2012), https://www.cdc.gov/csels/dsepd/ss1978/lesson3/section2.html. For example, if an individual was observed for sudden death for 5 years, he would have contributed five person-years to the study. Here, if the Court assumes that the population database tracked 1,000 individuals, each of whom took antipsychotic medication for ten years, the data predicts that ten to twenty-nine of those people would suffer sudden death. If the Court simultaneously tracked 1,000 people without antipsychotic symptoms for ten years, the data would indicate that seven to fourteen individuals in that group would suffer sudden death. This data clearly indicates that individuals taking antipsychotic medication have a higher risk of sudden death. The Court notes that correlation is not causation, and there may be other factors that could lead to a higher death rate in general for the population suffering from psychotic illnesses who are being treated with antipsychotic medication. However, even assuming correlation is causation here, the risk of death is only minimally raised in the population taking antipsychotic medication *when compared to the average risk of death for the general adult population*.

MEMORANDUM DECISION AND ORDER - 10

witnesses—Dr. Kristina P. Lloyd and Dr. Charles A. Cloutier. Dkt. 70. Dr. Lloyd has several degrees and is a Doctor of Psychology. She is a Board-Certified Forensic Psychologist. Dr. Lloyd has approximately twenty years of experience in the psychology field, has been a guest lecturer, and has coauthored thirteen different papers. Dr. Cloutier is a Doctor of Medicine and is a Board-Certified Psychiatrist. Dr. Cloutier has worked as a psychiatrist for approximately two decades for a variety of organizations. Villalobos did not offer any experts to support his case and provided no information to contradict the Government's experts' findings.

During the hearing, Dr. Lloyd testified that she did not expect Villalobos' mental illness to improve without antipsychotic medication, but that there is a substantial likelihood such treatment would restore his mental capacity. She also testified psychotherapy alone would not be effective in restoring Villalobos to competency based on her experience. Additionally, while Villalobos is not aggressive, his delusions do impair his ability to interact with others appropriately. Dr. Lloyd testified that while there is less research on restoring individuals with delusional disorder to competency when compared to schizophrenia, there is still a 73.3% success rate in restoring individuals with delusional disorders to competency.

Like Dr. Lloyd, Dr. Cloutier's testimony echoed the findings in the Addendum. Dr. Cloutier testified that using a second-generation drug such as risperidone will help lower the risks for side effects. Dr. Cloutier also stated that by starting at a low milligram dosage, and working up to the least effective dose, the side effects of risperidone would be minimized. However, Dr. Cloutier acknowledged that some side effects occur in a quarter

to a third of patients.

After the hearing was held, the Government and Defense informally stipulated via email that if the Government's motion for involuntary medication is granted, the Court's order should include a requirement for monthly written reports and set a status conference for three months from the date of the order in order to determine whether progress is being made and if medical staff continues to hold the opinion competency is likely to be restored.

To assist the Court's determination of whether Villalobos' actions qualify as serious, Probation calculated a preliminary guideline sentencing range for Villalobos. If Villalobos was convicted of all counts and did not accept responsibility for his actions, the guideline range for sentencing would be between 558 to 577 months. If Villalobos did accept responsibility and the offense levels were reduced, the guideline range would be adjusted to 537 to 551 months.

## III. LEGAL STANDARD

Determining whether the Government can involuntarily administer drugs to a prisoner is not something that is done lightly, and the Supreme Court has stated that ruling in favor of involuntary medication "may be rare." *Sell v. United States*, 539 U.S. 166, 180 (2003). The Supreme Court has "recognized that an individual has a significant constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs." *Id*. at 178 (quoting *Washington v. Harper*, 494 U.S. 210, 221 (1990) (cleaned up)). While this interest was upheld in *Riggins v. Nevada*, the *Riggins* Court also held an essential or overriding state interest might overcome that liberty interest. 504 U.S. 127, 134–35 (1992). In *Sell*, the Supreme Court established a standard that balances the

competing interest of the government and the individual. 539 U.S. 166.

The *Sell* test has four requirements to determine whether to permit "involuntary administration of drugs solely for trial competence purposes." *Id*. at 180. The Supreme Court emphasized that this test is only "to determine whether involuntary administration of drugs is necessary to significantly further . . . the interest in rendering the defendant *competent to stand trial*." *Id*. at 182 (emphasis in original). The Ninth Circuit has held that this means "that resorting to a *Sell* hearing is appropriate only if there is no other legitimate reason for treating the inmate." *U.S. v. Loughner*, 672 F.3d 731, 759 (9th Cir. 2012). The burden is clearly on the Government to show "a need for that treatment" that is "sufficiently important to overcome the individual's protected interest in refusing it." *Sell*, 539 U.S. at 183. The Government must show "clear and convincing evidence" at every factor. *U.S. v. Ruiz-Gaxiola*, 623 F.3d 684, 692 (9th Cir. 2010).

The first requirement is that "a court must find that *important* governmental interests are at stake." *Sell*, 539 U.S. at 180 (emphasis in original). Notably, "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important." *Id*. However, the interest in prosecution may be lessened by special circumstances. *Id*. For example, a defendant's failure to voluntarily take drugs may lead to a "lengthy confinement in an institution for the mentally ill," which "diminish[es] the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id*. However, the Supreme Court clarified that civil commitment is not a substitute for a criminal trial because the Government still has a substantial interest in timely prosecution. *Id*.

Second, "the court must conclude that involuntary medication will *significantly*

*further* those concomitant state interests." *Id*. at 181 (emphasis in original). Administration of the drugs must be "substantially likely to render the defendant competent to stand trial" while the drugs must also be "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id*.

Third, "the court must conclude that involuntary medication is *necessary* to further those interests." *Id*. (emphasis in original). "The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id*. In addition, "the court must consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Id*.

Fourth, and finally, "the court must conclude that administration of the drugs is *medically appropriate, i.e.*, in the patient's best medical interest in light of his medical condition." *Id*. The Supreme Court added that "[t]he specific kinds of drugs at issue may matter here as elsewhere. Different kinds of antipsychotic drugs may produce different side effects and enjoy different levels of success." *Id*.

In *U.S. v. Loughner*, the Ninth Circuit reviewed several Supreme Court cases involving involuntary medication, including *Harper*, 494 U.S. 210, *Riggins*, 504 U.S. 127, and *Sell*, 539 U.S. 166 (2003). 672 F.3d 731 (9th Cir. 2012). The Ninth Circuit started by noting that "*Sell* orders are disfavored." *Id*. at 750. The Ninth Circuit held that courts *must* "explore other procedures, such as *Harper* hearings (which are to be employed in the case of dangerousness) before considering involuntary medication orders under *Sell*." *Id*. at

749.[5] Furthermore, "if a district court does not conduct a dangerousness inquiry under *Harper*, it should state for the record why it is not doing so." *Id*. quoting *United States v. Hernandez–Vasquez*, 513 F.3d 908, 914 (9th Cir. 2008)) (cleaned up). The Ninth Circuit has encouraged courts to inquire into the reasons why a *Harper* dangerousness hearing is not applicable, even when the parties have agreed to proceed to a *Sell* hearing. *Hernandez-Vasquez*, 513 F.3d at 915. Additionally, district court judges must decide questions of pretrial involuntary medication—they cannot delegate such decisions to a magistrate judge. *Loughner*, 672 F.3d at 749.

Within the Ninth Circuit, the first factor is a legal question, while the other three are factual questions. *Hernandez-Vasquez*, 513 F.3d at 915. A *Sell* order is not a blank check that grants the Government the power to forcibly medicate an individual. The order must contain:

> (1) the specific medication or range of medications that the treating physicians are permitted to use in their treatment of the defendant, (2) the maximum dosages that may be administered, and (3) the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress.

*Id*. at 916–17. While not unrestricted, this order "should be broad enough to give physicians a reasonable degree of flexibility in responding to changes in the defendant's condition." *Id*. at 917.

---

[5] In other words, a *Harper* hearing is held to determine if a prisoner is so dangerous that he needs to be forcibly medicated for his safety or the safety of those around him.

## IV. ANALYSIS

The only question before the Court is whether the Government has met its burden under *Sell*. Both parties, as well as the staff at FMC Butner, have agreed that Villalobos is not dangerous to people around him at the facility in his current unmedicated state, so *Harper* does not apply. The Addendum reported that Villalobos has lived in an open mental health unit and is "behaviorally stable [and] did not show any impairment in his daily functioning." Dkt. 69, at 1. Additionally, FMC Butner stated that there have not been any incident reports involving Villalobos. *Id*. There is no evidence that Villalobos has shown any violent tendencies since his incident with the FBI, and, based on the observations of the staff of FMC Butner, the Court agrees with the parties that *Harper* is not applicable.

It also is worth noting that the question is not one of competency—every medical professional that has reviewed Villalobos (Dr. Franklin, Dr. Nybo, and the FMC Butner staff) has concluded that Villalobos is not currently competent to stand trial. These professionals not only reviewed his record, but also spent hours interviewing Villalobos and some of his close family and friends. The psychiatrists also reviewed Villalobos' digital presence on certain social media sites. Because of the weight of this evidence, the Court previously held that Villalobos was incompetent to stand trial (Dkt. 52) and neither party has presented evidence indicating any change in Villalobos since then. Thus, the only analysis remaining is the *Sell* factors.

### A. Important Governmental Interests

The first requirement is that "a court must find that *important* governmental interests are at stake." *Sell*, 539 U.S. at 180 (emphasis in original). The Supreme Court stated at the

outset that "[t]he Government's interest in bringing to trial an individual accused of a serious crime is important. That is so whether the offense is a serious crime against the person or a serious crime against property." *Id*. However, the importance of prosecuting an individual accused of a serious crime can be lessened by "facts of the individual case." *Id*.

The Ninth Circuit has used a two-step inquiry to analyze the first *Sell* factor. *U.S. v. Onuoha*, 820 F.3d 1049, 1054 (9th Cir. 2016) ("*Onuoha I*"). At the first step, a court considers "whether the alleged crime is sufficiently 'serious' to establish an important governmental interest." *Id*. At the second step, a court considers whether any "special circumstances" lessen that interest. *Id*. This is not a "totality-of-the-circumstances test." *Id*.

1. *Important Governmental Interest*

The Ninth Circuit has not established a bright-line rule to distinguish between serious crimes and minor ones, citing to the "breadth of the Supreme Court's concern that the Government be able to bring an accused to trial." *Hernanda-Vasquez*, 513 F.3d at 917–18. However, the Ninth Circuit has identified several hallmarks of a serious crime for the purposes of a *Sell* order. "[T]he U.S. Sentencing Guidelines range is the appropriate starting point" for the analysis of the severity of the crime "because it is the best available predictor of the length of a defendant's incarceration." *Onuoha I* at 1054–55 (cleaned up). The Ninth Circuit has previously held there are important governmental interests for crimes with sentencing ranges for as low as 27–33 months. *Id*. at 1057. Higher sentences have also been found to be serious and correspondingly important. *See, e.g.*, *Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014) (range of 33 to 41 months); *Ruiz–Gaxiola*, 623 F.3d at 694 (range of 100 to 125 months); *Hernandez–Vasquez*, 513 F.3d at 911–12 (range of 92 to

115 months).

The guideline range is "not, however, the only factor that should be considered." *Hernandez–Vasquez*, 513 F.3d at 918. The Ninth Circuit has also looked at "specific facts of the alleged crime as well as the defendant's criminal history" in determining the seriousness of a crime. *Onuoha I*, 820 F.3d at 1055. The lengthy criminal history of the defendants in both *Ruiz-Gaxiola* and *Hernanda-Vasquez* influenced the Ninth Circuit's decision to hold "that the crimes at issue were sufficiently serious." *Id*.

The Ninth Circuit has also typically held that an important government interest exists where the crime was a crime of violence. "In *Gillenwater* . . . [the Ninth Circuit] determined that the defendant's threats to choke, rape, and kill government officials and employees was sufficiently serious criminal conduct to satisfy the first *Sell* factor despite the low Guidelines range of 33 to 41 months." *Id*. The Ninth Circuit has also allowed *Sell* orders in cases such as *Loughner* (mass shooting resulting in the deaths of six people and injuries to thirteen others, including U.S. Representative Gabby Giffords), *Onuoha II* (defendant intimated that a terrorist attack at LAX airport was imminent by calling TSA, stating he was going to deliver a message to America, and warning them to evacuate), *Springs* (defendant threatened to kill federal judges), *Ballesteros* (defendant "was charged with assaulting a federal officer, use of a firearm in relation to a crime of violence, and attempted murder"), *Williams* (rape), and *Steward* ("threatening to assault and threatening to murder two United States judges with the intent to impede, intimidate, interfere with, and retaliate against them while they were engaged in, and on account of, the performance of their official duties"). *Loughner*, 672 F.3d at 735; *United States v. Onuoha*, 686

MEMORANDUM DECISION AND ORDER - 18

Fed.Appx. 401, 402 (9th Cir. 2017) ("*Onuoha II*"); *United States v. Springs*, 687 Fed.Appx. 672, 674 (9th Cir. 2017); *United States v. Ballesteros*, 211 Fed.Appx. 610, 610 (9th Cir. 2006); *United States v. Williams*, 491 Fed.Appx. 786, 787 (9th Cir. 2012); *United States v. Steward*, 343 Fed.Appx. 252, 253 (9th Cir. 2009).

In addition, the Ninth Circuit has held "the Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one." *Hernandez-Vasquez*, 513 F.3d at 913. An incompetent defendant cannot receive a fair trial because he or she does not grasp the gravity of the situation, which affects the defendant's judgment.

As noted, here Probation has calculated that, according to the guideline range, Villalobos could be sentenced for between 558 to 577 months. If Villalobos did accept responsibility and the offense levels were reduced, the guideline range would be adjusted to 537 to 551 months. Even with an adjustment for acceptance of responsibility, Villalobos is looking at a minimum of forty-four years in prison if he is convicted. This is almost twenty times longer than the minimum sentence that qualified as "serious" in *Onuoha I*.

Like the defendants in *Gillenwater*, *Loughner*, *Onuoha II*, *Springs, Ballesteros, Williams*, and *Steward*, Villalobos engaged in an act of violence by shooting at FBI officers who were serving a warrant, wounding one of them. Similar to the defendant in *Gillenwater*, Villalobos' actions were against "people who serve our country." *Gillenwater*, 749 F.3d at 1101. By prosecuting Villalobos, "the government is seeking 'to protect through application of the criminal law the basic human need for security.'" *Id*. (quoting *Sell*, 539 U.S. at 180).

MEMORANDUM DECISION AND ORDER - 19

Because of the lengthy sentencing guideline and the act of violence that Villalobos engaged in, it is clear that the alleged crime is sufficiently serious to establish an important governmental interest. Additionally, both the Government and Villalobos have an important interest in ensuring that Villalobos receives a fair trial.

## 2. Special Lessening Circumstances

Pursuant to the two-step analysis, the Court next examines any "[s]pecial circumstances [that] may lessen the importance of [the government's] interest." *Sell*, 539 U.S. at 180. "Such special circumstances include the time a defendant has served while awaiting trial and the possibility of future confinement." *Hernandez-Vasquez*, 513 F.3d at 918 (citing *Sell*, 539 U.S. at 180).

In *Onuoha I*, the Ninth Circuit held that even though the defendant had already spent more months in prison than the minimum Guidelines range called for, this was not a special circumstance because "general deterrence of the serious crime at issue . . . is also an important consideration." *Onuoha I*, 820 F.3d at 1057. An interest may also be lessened if the defendant is a candidate for civil commitment. *Sell*, 539 U.S. at 180.

Here, Villalobos has not come close to spending more months in prison than the guidelines call for. Deterring individuals from shooting at federal agents is an "important consideration." *Onuoha I*, 820 F.3d at 1057. Nothing in the record indicates that Villalobos is a candidate for civil commitment. Villalobos has not argued that any delay resulting from the restoration process will interfere with either the Government's interest in timely prosecution, or his constitutional right to a fair trial. As such, the Court finds that there are no special circumstances that lessen the Government's important interest in bringing a

competent Villalobos to trial to prosecute him for his serious crimes.

## B. Involuntary Medication Will Significantly Further Those Interests

In the second step of the *Sell* test, the government must "make a two part showing to establish that involuntary medication will significantly further the important governmental interests at stake." *Gillenwater*, 749 F.3d at 1102. The government must first show that "administration of the drugs is substantially likely to render the defendant competent to stand trial." *Sell*, 539 U.S. at 181. Second, the government must also show that "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." *Id*. A court's analysis here must focus on what involuntary medication *will* do, not what it is *designed* to do. *Ruiz-Gaxiola*, 623 F.3d at 696.

In *Gillenwater*, the Ninth Circuit upheld the district court's finding that the administration of haloperidol was "substantially likely to decrease Gillenwater's delusional beliefs" so that he could participate in trial. 749 F.3d at 1102. The Ninth Circuit pointed to evidence in the record that "several recent studies [indicate] . . . more than 70% of persons suffering from delusional disorder saw an improvement in their symptoms when treated with antipsychotic medication." *Id*. at 1103. The Ninth Circuit saw no issue with the fact that such studies were not double-blind or placebo controlled because the experts had testified that "it would be very difficult, if not impossible" to do so. *Id*.

Here, the Government has met its burden of showing that "administration of the drugs is substantially likely to render the defendant competent to stand trial." *Sell*, 539 U.S. at 181. Both Dr. Lloyd and Dr. Cloutier, each of whom have significant industry

experience, have testified they believe medication will render Villalobos competent for trial. This belief is supported by quantitative data, as studies have shown that antipsychotic medication has a 73.3% success rate in restoring individuals with delusional disorders to competency. While this number does rely on a limited sample of individuals (fifteen), the sample size is still large enough for the Court to place a reasonable weight on the high success rate. In addition, the fact that antipsychotic medications work similarly well for other psychotic disorders with a larger sample size, such as schizophrenia, indicates that the 73.3% success rate is not likely inflated by a nonrepresentative sample size. Additionally, it is understandable that this sample size is limited due to the unique nature of the disorders and the fact that, as the Ninth Circuit has acknowledged, it is difficult or impossible to do controlled studies. *Gillenwater*, 749 F.3d at 1103.

The Government has also met its burden of showing that "administration of the drugs is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." *Sell*, 539 U.S. at 181. Some of the possible side effects include neuromuscular side effects, including extrapyramidal symptoms, which involves brief episodes of muscle tightness or a spasm. Other possible side effects include weight gain, emergence/worsening of diabetes, and high cholesterol. The possibility of these side effects, while real, is not high. Further, none of these side effects would interfere with defendant's ability to assist counsel in conducting trial defense. In the rare event a serious episode of muscle tightness occurs during a trial, it would be a simple matter for the Court to take a recess to ensure Villalobos receives treatment and his symptoms pass. While there are serious side effects that could not only

substantially interfere with, but end Villalobos's ability to participate in a trial—such as neuroleptic malignant syndrome or even death—the odds of those effects occurring are low. For example, the risk of death is only three to fifteen events higher per 10,000 person years.

Furthermore, and this cannot be emphasized enough, Dr. Lloyd and Dr. Cloutier testified without contradiction. Villalobos offered no expert witnesses to testify in his behalf, and his counsel presented no medical findings that contradicted the findings of the experts from FMC Butner.

## C. Involuntary Medication is Necessary to Further Those Interests

The third *Sell* factor requires the government to show that involuntary medication is necessary to further the important governmental interests at stake and to show that "any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Sell*, 539 U.S. at 181. In *Sell*, the Supreme Court suggested that a trial court should "consider less intrusive means for administering the drugs, e.g., a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Sell*, 539 U.S. at 181. In *Gillenwater*, the Ninth Circuit affirmed the district court's decision that voluntary psychotherapy was not a viable alternative treatment because: (1) Gillenwater did not realize that he had a mental disorder; and (2) Gillenwater did not trust anyone, which is a major roadblock to voluntary psychotherapy. 749 F.3d at 1104.

Here, like in *Gillenwater*, both Dr. Lloyd and Dr. Cloutier have testified, uncontradicted, that psychotherapy will likely not restore Villalobos to competency. No other possible methods of restoration were proposed by Villalobos, who offered no

evidence to show that psychotherapy was a viable alternative.

A court order, while less intrusive, would likely prove fruitless. Dr. Lloyd explained that in her experience, contempt orders had been largely ineffective. Of the three contempt orders given to prisoners at FMC Butner, only one was met with success. The refusal of the two prisoners to follow contempt orders led to significant delays in the court proceedings. As Villalobos has been deemed incompetent to stand trial by three separate physicians, and suffers from a delusory disorder that severely distorts his view of the world around him, it is unlikely that he would understand—or comply with—a contempt order from the Court.

Consequently, the Court holds that involuntary medication is necessary to achieve the important governmental interests here and can find no less intrusive way to achieve such interests.

### D. Administration of Drugs is Medically Appropriate

The fourth *Sell* factor requires that the proposed treatment plan is "*medically appropriate*, *i.e.*, in the patient's best medical interest in light of his medical condition." *Sell*, 539 U.S. at 181. When analyzing this factor, "courts must rely on the testimony of medical experts in evaluating the constitutionality of involuntary medication." *Onuoha I*, 820 F.3d at 1060.

For example, in *Onuoha I*, the Ninth Circuit struck down a *Sell* order because: 1) the district court had miscalculated how much medication it had approved the doctor to give to the defendant; and 2) the plan called for the defendant to be given the highest possible non-starting dose of the medicine, to be proceeded only by a twenty-four hour

MEMORANDUM DECISION AND ORDER - 24

observation period of the defendant to look for possible side effects. *Onuoha I*, 820 F.3d at 1058–59. The Ninth Circuit attributed the high dosage without build up to the doctor's interest in restoring competency quickly, and held the court's failure to look out for the defendant's best interest violated the fourth *Sell* factor. *Id*. at 1058. In *Gillenwater*, the Ninth Circuit affirmed the district court's *Sell* order because, *inter alia*, the defendant was given a small test dose and would be closely monitored, and his treatment would be adjusted if side effects did emerge. 749 F.3d at 1104. It also was clear that treatment would provide the defendant relief from his delusions, which would give him the chance to lead a fulfilling life. *Id*. at 1105. As such, the Ninth Circuit held that haloperidol decanoate, despite possibly severe side effects, was in the best interest of the defendant. *Id*.

Here, Dr. Cloutier proposes giving Villalobos risperidone, with haloperidol used as a backup.[6] Antispychotic medication is a widely accepted part of treatment for individuals with delusional disorder, and giving Villalobos such medication would help him to live free from delusions. Villalobos' delusions are not confined to his inability to stand for trial—they have profoundly influenced his relationships with those closest to him. Giving Villalobos medication will help him reunite with his loved ones rather than viewing them as enemies in his conspiratorial delusions. The high success rate of antipsychotic medication in individuals with delusional disorder clearly indicates that this treatment would make a positive difference in his life.

---

[6] Notably, the Ninth Circuit approved the use of risperidone in *Loughner*, 672 F.3d at 759, and the use of haloperidol in *Gillenwater*, 749 F.3d at 1105. While this does not excuse the need for this Court to determine that application of these drugs *to Villalobos* is in his best interest, it does show that the Ninth Circuit has not found anything inherently wrong with the use of risperidone or haloperidol.

As explained in the facts, there are possible side effects. However, the possibility of the serious side effects, such as death, is extremely low. The side effects that are more likely to occur, such as EPS and weight gain, are not as detrimental to Villalobos in the long term. Additionally, the odds of such side effects occurring are not high, and  FMC Butner has a sound plan to counteract such effects.

The Court does not mean to minimize the risks that come with these drugs. To the contrary, such risks are something the Court takes extremely seriously. However, any medication, including FDA approved drugs, come with a certain amount of risk. Here, as Dr. Lloyd and Dr. Cloutier testified,  FMC Butner's plan to gradually increase the dosage over time is a prudent way to mitigate any possible risks. FMC Butner's plan to give Villalobos the minimum necessary dosage will also mitigate possible risks.

### E. Appropriate Time

The Ninth Circuit has held that a "Sell order must identify 'the duration of time that involuntary treatment of the defendant may continue before the treating physicians are required to report back to the court on the defendant's mental condition and progress.'" *U.S. v. Brooks*, 750 F.3d 1090, 1098 (9th Cir. 2014) (quoting *Hernandez–Vasquez*, 513 F.3d at 917).

Here, the parties have already agreed that the Court should require monthly written reports and schedule a status conference in three months to assess Villalobos' progress and whether the medical staff believes that competency has been, or is likely to be, restored. The Court holds that such measures are appropriate and, in keeping with Ninth Circuit precedent, and the above temporal guidelines are so ordered.

MEMORANDUM DECISION AND ORDER - 26

## F.  Appropriate Dosage

A *Sell* order must contain (1) the specific medication(s) that physicians may use to treat the defendant, (2) the maximum dosage that may be administered. *Hernandez-Vasquez*, 513 F.3d at 916–17. While not unrestricted, this order "should be broad enough to give physicians a reasonable degree of flexibility in responding to changes in the defendant's condition." Id. at 917.

Dr. Cloutier has stated he plans to administer 1 mg of risperidone daily to Villalobos. This dose would be gradually increased over time, by 1 mg increments in 1-2-week intervals, to a maintenance dose somewhere between 3-6 mg. If that fails because Villalobos refuses oral risperidone, haloperidol will be used. Under that medication regime, Villalobos would be given a one-time injection of the immediate-acting haloperidol lactate. If there is no evidence of an allergic reaction, Villalobos would be given a low dose of 25 mg of the long-acting haloperidol decanoate every two weeks (or 50mg every four weeks), which would then be maintained or increased based on Villalobos' response, with a maximum dosage of 100 mg given every two weeks, or 200 mg administered every four weeks.[7]

---

[7] FMC Butner did not provide the maximum maintenance dose for haloperidol. It does indicate that it will start Villalobos at 25mg every two weeks, and then will increase monthly by 25 mg increments as needed. Clearly, FMC Butner expects that multiple "increments" may be made, indicating that Villalobos may receive 50, 75, or 100 mg every two weeks (or twice that number every four weeks). Although it does not provide the maximum dose, prior cases illustrate what maximum level of haloperidol is appropriate. The Central District of California, in a case affirmed by the Ninth Circuit, found that 200 milligrams of long-acting haloperidol was appropriate every month as it fell well within the "recommended range provided by the medical literature" and is the average adult dosage. *United States v. Onuoha*, 2016 WL 7479405, at *12–*13 (C.D. Cal., Oct. 13, 2016). Therefore, this Court holds that **200 mg administered every four weeks, or 100 mg administered every two weeks, is the maximum dose of haloperidol** that Villalobos may be given. However, FMC Butner should still increase dosage in 25 mg increments, and only administer the least necessary dose.

Dr. Cloutier also recommended adjunctive treatment (anticholinergic, benzodiazepines, or mood stabilizers) only as needed, to manage side effects or improve treatment response. Because of Dr. Cloutier's plan to start with lower doses, combined with the intent to carefully observe Villalobos to immediately treat any possible side effects if they arise, the Court approves the above-described doses of risperidone, with haloperidol to be used as a backup in the manner prescribed by FMC Butner. As there is no way to adequately predict what adjunctive medications will be needed, the Court more broadly approves the use of adjunctive medications to be used only as needed, at the least effective dose necessary. As the side effects of adjunctive medications are significantly less controversial than the use of antipsychotic medications, the broader approval of such adjunctive medications is appropriate. Additionally, the use of such medications must be addressed in the monthly status reports.

## V. ORDER

The Court HEREBY ORDERS:

1. The Government's Motion for Involuntary Medication (Dkt. 59) is GRANTED. Medication may be administered to Villalobos in accordance with the conditions, procedures, and limitations described above.

DATED: March 10, 2022

David C. Nye
Chief U.S. District Court Judge

MEMORANDUM DECISION AND ORDER - 28