

Ryan Farrell
Trial Attorney
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for Manuel P. Villalobos

# United States District Court
## District of Idaho
### Honorable David C. Nye

| | |
|---|---|
| United States, | No. 3:19-CR-40-DCN-1 |
| Plaintiff, | Memorandum In Support of Motion to Dismiss Count One of the Indictment |
| v. | |
| Manuel P. Villalobos, | |
| Defendant. | |

# Table of Contents

I.    Introduction.................................................................................................................1

II.   Discussion .................................................................................................................. 2

      A.    *Bruen* changed the standard for evaluating firearm regulations under the Second
            Amendment....................................................................................................... 2

      B.    The Second Amendment protects Mr. Villalobos because he is part of "the
            people." ............................................................................................................ 4

      C.    Section 922(g)(1) violates the Second Amendment because there is no historical
            tradition of disarming felons in the founding era.......................................... 7

            1.    *Bruen* set forth a two-track analysis under its historical component. .......... 7

            2.    The stringent "distinctly similar" test applies because § 922(g)(1)
                  addresses a problem that was well-known in the founding era. ................. 11

      D.    The Ninth Circuit's precedent upholding § 922(g)(1) does not survive *Bruen*
            because this Circuit never engaged in the historical analysis *Bruen* requires. ....... 15

III.  Conclusion................................................................................................................18

## I.    Introduction

Federal law prohibits Manuel Villalobos from possessing any firearm because he has a past felony conviction. 18 U.S.C. § 922(g)(1). That law violates the Second Amendment to the United States Constitution, which codifies the right of "the people" to possess firearms. In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court upended the framework for evaluating the constitutionality of firearm regulations. 142 S. Ct. 2111 (2022). Under the new *Bruen* test, a firearm regulation is constitutional only if the government can prove that it "is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. Section 922(g)(1) does not survive after *Bruen* for the following three reasons:

*First*, Mr. Villalobos is part of "the people" protected by the Second Amendment. *U.S. v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022). The Second Amendment is one of several amendments passed in the Bill of Rights that refers to "the people." Felons retain their rights as part of "the people" under the other Bill of Rights amendments that use that term of art. As the Second Amendment is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," felons must also retain their Second Amendment rights despite their conviction. *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010).

*Second*, the government cannot carry its burden to show that § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S.

Memorandum in Support of Motion to Dismiss Count One

Ct. at 2130. The problem of felons in possession of firearms was well-known to the Founders in 1791 but the first laws addressing this issue were not passed until the 20th century. Under *Bruen*, the lack of "a comparable tradition of regulation" in the founding era means § 922(g)(1) is unconstitutional.

*Third*, pre-*Bruen* Ninth Circuit precedent upholding § 922(g)(1) no longer applies. The Ninth Circuit has never engaged in the historical analysis *Bruen* demands. Because *Bruen* "upended the constitutional framework for reviewing . . . firearm regulations," courts can no longer rely on conclusions drawn by cases that failed to apply the new, controlling framework. *U.S. v. Alaniz*, No. 1:21-cr-243, 2022 WL 4585896, at *3 (D. Idaho Sept. 29, 2022).

For those reasons, § 922(g)(1) cannot survive in a post-*Bruen* world. Mr. Villalobos cannot be charged with violating an unconstitutional law and Count One must be dismissed.

## II.    Discussion

### A.    *Bruen* changed the standard for evaluating firearm regulations under the Second Amendment.

The Second Amendment provides that "the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II. That right is not bestowed on the people by the federal government; rather, the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation."

1   *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). This pre-existing right is not "a

2   second-class right, subject to an entirely different body of rules than the other Bill of

3   Rights guarantees." *McDonald*, 561 U.S. at 780.

4       Before *Bruen*, the Ninth Circuit joined other circuits in using a two-step test for

5   Second Amendment challenges. That test required courts to determine (1) "whether

6   the challenged law burdens conduct protected by the Second Amendment," and if so,

7   (2) whether the government could justify, under heightened scrutiny, the burden

8   imposed on a challenger's Second Amendment rights. *U.S. v. Chovan*, 735 F.3d 1127,

9   1136 (9th Cir. 2013). The second step's "heightened scrutiny" was usually

10   intermediate scrutiny, which requires "(1) the government's stated objective to be

11   significant, substantial, or important; and (2) a reasonable fit between the challenged

12   regulation and the asserted objective." *Id.* at 1138-39.

13       In *Bruen*, the Supreme Court emphatically rejected that two-step approach. *Id.*

14   at 2127. The Supreme Court instead adopted a "text-and-history standard" for

15   evaluating Second Amendment challenges. *Id.* at 2138. This standard's textual

16   component requires courts to answer a simple preliminary question—whether "the

17   Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does,

18   then "the Constitution presumptively protects that conduct." *Id.* The burden then

19   shifts to the government to rebut the presumption under the historical component. *Id.*

To do so, the government cannot follow the old playbook of showing that the

Memorandum in Support of Motion to Dismiss Count One

1  challenged law promotes an important interest. *See id.* Instead, "the government must

2  demonstrate that the regulation is consistent with this Nation's historical tradition of

3  firearm regulation." *Id.* Only a law that is consistent with the Nation's historical

4  tradition is constitutional under the Second Amendment. *Id.*

5    **B.**    **The Second Amendment protects Mr. Villalobos because he is part of "the people."**

6    The Second Amendment "presumptively protects" Mr. Villalobos's possession

7  of firearms because his conduct falls within "the Second Amendment's plain text." *Id.*

8  at 2126. The Second Amendment's operative clause protects "the right of the people

9  to keep and bear Arms." U.S. Const. amend. II. There is no question that possession of

10  firearms falls within the scope of "keep[ing] and bear[ing] Arms."[1] The only real issue

11  is whether Mr. Villalobos is part of "the people" even though he has a felony

12  conviction. He is for the following three reasons:

13    ***First,*** the "plain text" of the Second Amendment does not exclude felons from

14  its protection. Just as the amendment's text does not "draw[] a home/public

15  distinction with respect to the right to keep and bear arms," it does not draw a

16  felon/non-felon distinction. *Bruen*, 142 S. Ct. at 2134. It refers only to "the people."

17  U.S. Const. amend. II. Under *Bruen*, the "plain text" is what controls and "[n]othing

18

19  _____

[1] Count One of the indictment charges Mr. Villalobos with possessing eleven firearms, a combination of pistols and rifles. ECF No. 28. Those are quintessential "Arms." *See Heller*, 554 U.S. at 581-82. Likewise, to "keep" means "to retain in one's . . . possession" under the Second Amendment. *Id.* at 582.

1  in the Second Amendment's text" excludes those who have been convicted of a felony

2  from its protection. *Id.*

3        ***Second***, "the people" is a term of art with a consistent meaning across the Bill of

4  Rights. *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990). It is a cardinal rule of

5  interpretation "that identical words used in different parts of the same [law] are

6  generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34

7  (2005). The presumption of consistent meaning applies to the Bill of Rights because

8  "the first ten amendments were adopted as a package"—that is, all together at the

9  same time by the same Congress. *U.S. v. Meza-Rodriguez*, 798 F.3d 664, 670 (7th Cir.

10  2015). There is "no principled way to carve out the Second Amendment" from the

11  other Bill of Rights provisions and impose a different definition of "the people" in that

12  amendment alone. *Id.* at 672; *see also Jimenez-Shilon*, 34 F.4th at 1045 (seeing no

13  "textual, contextual, or historical reason to think that the Framers understood the

14  meaning of ["the people"] to vary from one provision of the Bill of Rights to

15  another."). Interpreting "the people" differently under the Second Amendment

16  would "subject [the Second Amendment] to an entirely different body of rules than the

17  other Bill of Rights guarantees," which the Supreme Court has expressly forbidden.

18  *McDonald*, 561 U.S. at 780. Thus, courts must look to the other Bill of Rights

19  provisions when defining "the people" under the Second Amendment.

1    ***Third***, felons retain their rights as members of "the people" under the other Bill

2    of Rights amendments. Felons still have "the right of the people . . . to petition the

3    Government for a redress of grievances" under the First Amendment, even while in

4    prison. *See, e.g.*, *Entler v. Gregoire*, 872 F.3d 1031, 1039 (9th Cir. 2017) (recognizing a

5    prisoner's First Amendment right to seek redress of grievances "[r]egardless of the

6    prisoner's misdeed—however reprehensible"). Felons also have the Fourth

7    Amendment "right of the people to be secure . . . against unreasonable searches and

8    seizures." *See, e.g.*, *U.S. v. Lara*, 815 F.3d 605 (9th Cir. 2016) (suppressing the

9    unreasonable search of a felon's cell phone under the Fourth Amendment). It follows

10   that a felony conviction does not exclude someone from "the people" under any Bill of

11   Rights amendment, including the Second. *Jimenez-Shilon*, 34 F.4th at 1046

12   (recognizing that even "dangerous felons" are "indisputably part of 'the people'").

13          The Second Amendment continues to protect Mr. Villalobos despite his past

14   felony conviction. The Second Amendment protects all "the people"; its plain text

15   makes no distinction based on criminal history. There is "no principled way" to define

16   "the people" differently under the Second Amendment than under the other Bill of

17   Rights amendments. *Meza-Rodriguez*, 798 F.3d at 672. Since a felony conviction does

18   not exclude Mr. Villalobos from "the people" under, for example, the First and Fourth

19   Amendments, it does not exclude him under the Second.

**C.      Section 922(g)(1) violates the Second Amendment because there is no historical tradition of disarming felons in the founding era.**

Because the Second Amendment applies, "the Constitution presumptively protects [Mr. Villalobos's] conduct." *Bruen*, 142 S. Ct. at 2126. To rebut this presumption, the government must establish that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government cannot carry that burden because there is no robust tradition of "distinctly similar" laws from the founding era.

**1.      *Bruen* set forth a two-track analysis under its historical component.**

In *Bruen*, the Supreme Court explained the standard for reviewing historical evidence depends on what kind of problem a statute is intended to address—specifically, whether that problem is old or new. *Id.* at 2131-32. Old problems are "general societal problems that ha[ve] persisted since the 18th century." *Id.* at 2131. In contrast, new problems are those involving "unprecedented societal concerns or dramatic technological changes" that were "unimaginable at the founding." *Id.* at 2132. Therefore, courts faced with a Second Amendment challenge must identify the problem at which the law was aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes." *Id.* at 2132. Only then will the court know which approach to employ.

1    When the challenged law addresses an old problem, the test is "fairly

2  straightforward"; the government must identify a tradition of "distinctly similar" laws

3  from the founding era. *Id.* Although *Bruen* did not expressly define "distinctly

4  similar," it indicated the standard is a stringent one. The only historical regulation

5  *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an

6  1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol

7  . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.*

8  at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was

9  essentially identical to New York courts' interpretation of that state's proper-cause

10  standard. *See id.* at 2123-24.

11    *Bruen* also noted that "*Heller* . . . exemplifies th[e] kind of straightforward

12  historical inquiry" demanded by the "distinctly similar" test. *Id.* at 2131. *Heller*

13  confirms that the standard is a strict one. When assessing the "total[] ban[]" on

14  handgun possession at issue in *Heller*, the Supreme Court identified only two historical

15  laws for comparison: a Georgia law and a Tennessee law, both of which prohibited the

16  open carry of pistols. 554 U.S. at 628-29. *Bruen* and *Heller* both show that the focus of

17  the "distinctly similar" test is on historical laws that are virtually identical to the

18  modern law.

19    When the challenged law addresses a new problem, the test is "more nuanced."

*Bruen*, 142. S. Ct. at 2132. Courts must determine if the challenged modern law fits into

1    a "relevantly similar" tradition of historical laws. *Id.* The Supreme Court identified

2    two "central considerations" for courts to determine if laws are relevantly similar:

3    "whether modern and historical regulations impose a comparable burden on the right

4    of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

5        The "relevantly similar" test is less difficult for the government to satisfy

6    because it allows for "analogical reasoning." *Id.* at 2132. But courts may use this test

7    only when the challenged law is aimed at a societal problem that was "unimaginable at

8    the founding." *Id.* It is not available when the challenged law addresses an old

9    problem—that is, one which "has persisted since the 18th century." *Id.* at 2131. When

10    a law addresses an old problem, it must satisfy the stringent "distinctly similar" test;

11    there must be a historical tradition of laws that are virtually identical to the modern

12    law. *Id.* at 2153; *Heller*, 554 U.S. at 628-29.

13        Regardless of whether the case calls for the stringent "distinctly similar" or the

14    looser "relevantly similar" test, the relevant "historical tradition" is that which

15    existed when the Second Amendment was ratified in 1791. *Bruen*, 142 S. Ct. at 2136.

16    That is because "[c]onstitutional rights are enshrined with the scope they were

17    understood to have *when the people adopted them.*" *Id.* (emphasis in original). Courts

18    may look to the tradition of firearms regulation "before . . . and even after the

19    founding" period, but should do so with care. *Id.* at 2131-32. *Bruen* cautioned that

"[h]istorical evidence that long predates [1791] may not illuminate the scope of the

1  [Second Amendment] right if linguistic or legal conventions changed in the intervening

2  years." *Id.* at 2136. Courts should not rely on practices "that had become obsolete in

3  England at the time of the adoption of the Constitution and never [were] acted upon or

4  accepted in the colonies." *Id.*

5      Likewise, courts must not "giv[e] postenactment history more weight than it

6  can rightly bear." *Id.* While evidence "of how the Second Amendment was interpreted

7  from immediately after its ratification through the end of the 19th century represent[s]

8  a critical tool of constitutional interpretation," historical evidence becomes less

9  probative the farther forward in time one goes from 1791. *Id.* at 2136-37. The Court

10  recognized that "discussions of the right to keep and bear arms" that took place after

11  the Civil War provided less insight into the Second Amendment's original meaning

12  than earlier sources because they took place 75 years after its ratification. *Id.* at 2137.

13  Courts therefore should credit such later history to the extent it is consistent with prior

14  practice but should otherwise afford it little weight. *See id.* After all, "post-ratification

15  adoption or acceptance of laws that are *inconsistent* with the original meaning of the

16  constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in

17  original); *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" because

18  it is too far removed from 1791).

19      Furthermore, the comparable tradition of regulation must be "well-established

and representative." *Id.* at 2133; *see also id.* at 2137 (explaining that "a governmental

Memorandum in Support of Motion to Dismiss Count One

1    practice" can guide [courts'] interpretation of an ambiguous constitutional provision"

2    only if that practice "has been open, widespread, and unchallenged since the early days

3    of the Republic."). A handful of 'outlier[]'' statutes or cases from a small number of

4    "outlier jurisdictions" are not enough to establish a historical tradition. *Id.* at 2153,

5    2156. For instance, the Supreme Court doubted laws from three of the thirteen original

6    colonies were enough to show a relevant tradition. *See id.* at 2142.

7        Finally, *Bruen* emphasized that "the burden falls on [the government] to show

8    that [a law] is consistent with this Nation's historical tradition of firearm regulation."

9    *Id.* at 2135. Consistent with "the principle of party presentation," courts are "entitled

10   to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6.

11   Accordingly, courts "are not obliged to sift the historical materials for evidence to

12   sustain [a] statute. That is [the government's] burden." *Id.* at 2150. And insofar as

13   there are "multiple plausible interpretations" of an ambiguous historical record, courts

14   must "favor the one that is more consistent with the Second Amendment's

15   command." *Id.* at 2141 n.11; *see also id.* at 2139 (concluding that where "history [is]

16   ambiguous at best," it "is not sufficiently probative to defend" a law).

17            **2.    The stringent "distinctly similar" test applies because
18                    § 922(g)(1) addresses a problem that was well-known in the
                     founding era.**

19       The government must satisfy the demanding "distinctly similar" test because

§ 922(g)(1) addresses a "general societal problem"—i.e., felons' access to guns—that

Memorandum in Support of Motion to Dismiss Count One

1    existed when the Second Amendment was ratified in the 18th century.[2] To do so, the

2    government must show a robust tradition of virtually identical laws around 1791. *See*

3    *Bruen*, 142 S. Ct. at 2153 (comparing challenged law to virtually identical Texas law);

4    *Heller*, 554 U.S. at 628-29 (comparing challenged law to two virtually identical laws). A

5    historical law that is "distinctly similar" to § 922(g)(1) would thus be one that either

6    denied or substantially abridged *felons'* access to firearms. But such laws did not exist

7    until the 20th century.

8        Section 922(g)(1) "bears little resemblance to laws in effect at the time the

9    Second Amendment was ratified." *N.R.A. v. A.T.F.*, 700 F.3d 185, 196 (5th Cir. 2012).

10   In 2007, a history professor at the University of Hartford undertook "a full survey of

11   printed session laws pertaining to gun regulation in the thirteen colonies and Vermont

12   between 1607 and 1815." Robert H. Churchill, *Gun Regulation, the Police Power, and the*

13   *Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 143 & n.11 (2007). Based

14   on that survey, Mr. Churchill concluded that "at no time between 1607 and 1815 did

15   the colonial or state governments of what would become the first fourteen states

16   exercise a police power to restrict the ownership of guns by members of the body

17   politic." *Id.* at 142. A professor at the University of California-Davis School of Law

18

19   _____
     [2] The government cannot defend § 922(g)(1) through "analogical reasoning" and the "relevantly similar" test, which are reserved for statutes aimed at "unprecedented" problems that would have been "unimaginable" at the founding. *Bruen*, 142 S. Ct. at 2132. After all, the potential danger posed by felons' access to firearms would hardly have been foreign to the Founders.

1    agrees with Mr. Churchill, noting that "state laws prohibiting felons from possessing

2    firearms or denying firearms license to felons date from the early part of the twentieth

3    century." Carlton F.W. Larson, *Four Exceptions in Search of a Theory*, 60 Hastings L.J.

4    1371, 1376 (2009).

5      Other scholars agree. Although it is difficult "to prove a negative, one can with a

6    good degree of confidence say that bans on convicts possessing firearms were unknown

7    before World War I." C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32

8    Harv. J.L. & Pub. Pol'y 695, 708 (2009). It appears that no state passed a felon-

9    disarmament law until 1923. *Id.*; *see also* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L.

10   Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in

11   the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund,

12   *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343,

13   1357 (2009) (similar).

14      Federal law did not prohibit felons from possessing firearms for 195 years after

15   the Second Amendment was ratified. The journey to what is now § 922(g)(1) began

16   with the Federal Firearms Act of 1938 (FFA). In relevant part, the FFA prohibited

17   "any person who has been convicted of a crime of violence"[3] from shipping or

18

19    _____

[3] Disqualifying "crime[s] of violence" were limited to "murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year." FFA, ch. 850, § 1(6), 52 Stat. 1250, 1250.

transporting any firearm or ammunition in interstate or foreign commerce, or from receiving any firearm or ammunition that had been shipped or transported in interstate or foreign commerce. FFA, cg. 850, § 2(e)-(f), 52 Stat. 1250, 1251.

In 1968, the Omnibus Crime Control and Safe Streets Act of 1968 expanded the FFA's scope by prohibiting all felons, not just those convicted of specified violent crimes, from engaging in the proscribed conduct. Pub. L. No. 90-351, § 902, 82 Stat. 197, 230-31. But it still only forbade the shipping, transport, and receipt of firearms. *See id.* The law did not prohibit possession. *See id.* Congress did not prohibit felons from possessing firearms until 1986, when it amended § 922(g)(1) in the Firearm Owners' Protection Act, Pub. L. No. 99-308, § 102(6)(D), 100 Stat. 449, 452 (1986).

In short, there was no historical tradition circa 1791 of gun regulations "distinctly similar" to § 922(g)(1). The "Founders themselves could have adopted" felon-disarmament laws to address the "perceived societal problem" posed by felons' access to guns. *Bruen*, 142 S. Ct. at 2131. But they did not. Such laws were not passed until the 20th century. Regulations of such recent vintage cannot establish a historical tradition unless they "confirm[]" earlier practice. *Id.* at 2137. Because § 922(g)(1) does not fit in a robust historical tradition of distinctly similar regulations, it is unconstitutional.

**D.     The Ninth Circuit's precedent upholding § 922(g)(1) does not survive *Bruen* because this Circuit never engaged in the historical analysis *Bruen* requires.**

This District has twice relied on the Ninth Circuit's pre-*Bruen* precedent upholding § 922(g)(1) to deny motions to dismiss without conducting the historical inquiry *Bruen* requires.[4] Before *Bruen*, the Ninth Circuit had upheld § 922(g)(1) against constitutional challenge but had never used *Bruen*'s framework to do so. This District has recognized that "[n]o reasonable jurist could deny that . . . *Bruen* upended the constitutional framework for reviewing . . . firearm regulations." *Alaniz*, 2022 WL 4585896, at *3. Conclusions reached using an "upended . . . framework" no longer control the issue presented. *Bruen*'s historical inquiry must be conducted in this case for the following three reasons:

**First**, the sole criterion for constitutionality after *Bruen* is whether the challenged law "is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. The challenged law is constitutional "[*o*]*nly if*" it is consistent with that historical tradition. *Id.* (emphasis added). This historical test replaced the test that the Ninth Circuit, among others, had been using to evaluate Second Amendment challenges before *Bruen*. *Id.* at 2127.

---

[4] *See United States v. Wondra*, No. 1:22-CR-99-BLW, 2022 WL 17975985, at *2 (D. Idaho Dec. 27, 2022) ("Although [defendant] would like the Court to scrutinize the history of felon-in-possession statutes, such examination is unnecessary at this time. The Court is bound by *Vongxay* and the motion must be denied."); *United States v. Siddoway*, No. 1:21-CR-205-BLW, 2022 WL 4482739, at *2 (D. Idaho Sept. 27, 2022) (same).

1       ***Second***, the Ninth Circuit has never addressed whether § 922(g)(1) "is

2   consistent with the Nation's historical tradition" as *Bruen* now requires. *Id.* Instead,

3   the Ninth Circuit relied on a brief comment in *Heller* to dismiss challenges to

4   § 922(g)(1). *U.S. v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010). In *Vongxay*, the panel

5   rested on *Heller*'s statement that "[a]lthough we do not undertake an exhaustive

6   historical analysis today of the full scope of the Second Amendment, nothing in our

7   opinion should be taken to cast doubt on longstanding prohibitions on the possession of

8   firearms by felons" to uphold § 922(g)(1). *Id.* (quoting *Heller*, 554 U.S. at 626). At no

9   point in *Vongxay* or in any other case that Mr. Villalobos is aware of did the Ninth

10  Circuit conduct the historical inquiry that is now the sole criterion of constitutionality

11  after *Bruen*.

12      ***Third***, the Ninth Circuit's failure to conduct the historical inquiry means that its

13  pre-*Bruen* precedent has been effectively overruled. Prior Ninth Circuit authority is

14  effectively overruled "where [its] reasoning or theory . . . is clearly irreconcilable with

15  the reasoning or theory of intervening higher authority." *Miller v. Gammie*, 335 F.3d

16  889, 893 (9th Cir. 2003). The Ninth Circuit's reasoning or theory is clearly

17  irreconcilable when it cannot be applied without running afoul of the intervening higher

18  authority's reasoning or theory. *Close v. Sotheby's, Inc.*, 894 F.3d 1061, 1073 (9th Cir.

19  2018).

1    The Ninth Circuit's reasoning in *Vongxay* was essentially that § 922(g)(1) was

2  constitutional because *Heller* said it did not intend to "cast doubt" on that law. This is

3  clearly irreconcilable with what *Bruen* now commands. *Bruen* requires a searching

4  historical inquiry to determine if a challenged law fits into a robust tradition of

5  "distinctly similar" or "relevantly similar" firearm regulations from the founding era.

6  Not only did the Ninth Circuit fail to conduct that inquiry, but the panel rested its

7  holding on a comment from *Heller* that openly acknowledged that the Supreme Court

8  also had not done that inquiry. *Vongxay*, 594 F.3d at 1115 (quoting *Heller*, 554 U.S. at

9  626); *see also Heller*, 554 U.S. at 635 ("there will be time enough to expound upon the

10  historical justification[] for" this prohibition "if and when [it] come[s] before us.").

11    The Ninth Circuit's pre-*Bruen* precedent cannot be reconciled with *Bruen* when

12  the Ninth Circuit never did what *Bruen* requires. Reliance on an offhand comment in a

13  previous Supreme Court case that expressly deferred the analysis that *Bruen* now

14  requires also cannot reconcile *Vongxay* with *Bruen* because the history was never

15  examined. In *Heller* itself, the Court refused to "rest our interpretation of the basic

16  meaning of any guarantee of the Bill of Rights upon . . . a footnoted dictum in a case

17  *where the point was not at issue and was not argued*." 554 U.S. at 625 n.25 (emphasis

18  added). It is time to stop relying on a comment from a case where § 922(g)(1)'s

19  constitutionality was not at issue or argued to avoid *Bruen*'s mandate. *Bruen* commands

lower courts to determine if a challenged law "is consistent with the Nation's historical

Memorandum in Support of Motion to Dismiss Count One

– 17 –

tradition of firearm regulation." 142 S. Ct. at 2126. Because the Ninth Circuit has never done so, this Court must.

### III.   Conclusion

Mr. Villalobos's possession of firearms is protected by the Second Amendment because he is part of "the people" protected by the Bill of Rights, including the Second Amendment. The government cannot carry its burden to show a historical tradition of "distinctly similar" prohibitions on firearm possession by felons because such laws are creatures of the 20th century. As such, § 922(g)(1) violates the Second Amendment and Count One must be dismissed.

Dated: January 20, 2023.

Federal Defenders of Eastern Washington & Idaho
Attorneys for Manuel P. Villalobos

s/Ryan M. Farrell
Ryan M. Farrell, WSBA #58863
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
ryan_farrell@fd.org

1
Service Certificate

2
I certify that on January 20, 2023, I electronically filed the foregoing with the

3
Clerk of the Court using the CM/ECF System, which will notify Assistant United

4
States Attorneys: Bryce Ellsworth, David Robins, and Justin Whatcott.

5
<u>s/Ryan M. Farrell</u>
Ryan M. Farrell, WSBA #58863

6
10 North Post Street, Suite 700
Spokane, Washington 99201

7
t: (509) 624-7606
f: (509) 747-3539

8
ryan_farrell@fd.org

9

10

11

12

13

14

15

16

17

18

19