

Ryan Farrell
Trial Attorney
10 North Post Street, Suite 700
Spokane, Washington 99201
509.624.7606
Attorney for Manuel P. Villalobos

United States District Court
District of Idaho
Honorable David C. Nye

| United States, | No. 3:19-CR-40-DCN-1 |
| | |
| Plaintiff, | Memorandum In Support of Motion to Dismiss Count Ten of the Indictment |
| v. | |
| Manuel P. Villalobos, | |
| | |
| Defendant. | |

# Table of Contents

I.    Introduction ................................................................................................................. 1

II.   Background ................................................................................................................. 2

III.  Discussion ................................................................................................................... 3

    A.   *Bruen* changed the standard for evaluating firearm regulations under the Second Amendment. ........................................................................................................... 3

    B.   Silencers are protected by the Second Amendment, either explicitly or under the Amendment's implicit guarantees. ......................................................................... 5

        1.   Silencers are explicitly protected by the Second Amendment because they are "Arms" or accessories to "Arms." ......................................................... 5

        2.   Alternatively, silencers are implicitly protected by the Second Amendment because they are indispensable to effective enjoyment of the right to armed self-defense. ....................................................................................... 11

    C.   Section 5861(d) violates the Second Amendment because there is no historical tradition of requiring registration of "Arms" or their accessories in the founding era. ........................................................................................................................ 13

        1.   *Bruen* set forth a two-track analysis under its historical component. ........ 13

        2.   Under either the stringent "distinctly similar" test or the looser "relevantly similar" test, the government will be unable to carry its burden. .................................................................................................... 17

IV.   Conclusion ................................................................................................................ 20

## I.      Introduction

Federal law prohibits Manuel Villalobos from possessing certain "firearms"—which are statutorily defined to include silencers—unless such firearms are registered to him in the National Firearms Registration and Transfer Record (National Record). 26 U.S.C. § 5861(d). That law violates the Second Amendment to the United States Constitution, which codifies the right of "the people" to possess "Arms." Under *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2130 (2022), a firearm regulation is constitutional only if the government can prove that it "is consistent with the Nation's historical tradition of firearm regulation." Section 5861(d) is unconstitutional under the *Bruen* test for the following reasons:

*First*, silencers qualify as "Arms" under the Second Amendment's "plain text" because their noise-suppressing capability makes them necessary to the safe and effective use of firearms. Items that are necessary to use weapons effectively are themselves protected by the Second Amendment. *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016), *vacated on reh'g en banc on other grounds*, 849 F.3d 114 (4th Cir. 2017). Even if silencers were not themselves "Arms," the Second Amendment "implies a corresponding right" to obtain items necessary to exercise the right to armed self-defense the Amendment protects. *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 958 (9th Cir. 2014).

***Second***, the government cannot carry its burden to show that § 5861(d) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Although a handful of states began requiring firearm registration in the early 20th century, there is no widespread tradition of requiring registration of "Arms" around 1791, when the Second Amendment was ratified. Under *Bruen*, the lack of "a comparable tradition of regulation" in the founding era means § 5861(d) is unconstitutional. Mr. Villalobos cannot be charged with violating an unconstitutional law. Therefore, Count Ten must be dismissed.

## II.    Background

The National Firearms Act (the Act) creates "an interrelated statutory system for the taxation of certain classes of firearms." *Haynes v. United States*, 390 U.S. 85, 87 (1968). Relevant here, the Act and its implementing regulations direct the Secretary of the Treasury to "maintain a central registry of all firearms in the United States which are not in the possession or under the control of the United States." 26 U.S.C. § 5841(a). This registry is the National Record. Any firearm manufacturer is required to "register each firearm he manufactures, imports, or makes" in the National Record. § 5841(b). To register a firearm, a manufacturer must file a notice "set[ting] forth the name and address of the manufacturer, . . . the date of manufacture, the type, model, length of barrel, overall length, caliber, gauge or size, serial numbers, and other marks

1  of identification of the firearms he manufactures." 27 C.F.R. § 479.103; *see also* 26

2  U.S.C. § 5841(a).

3  Once a firearm is registered in the National Record, it "shall not be transferred"

4  until its current possessor has filed, and the Secretary has approved, an application

5  "for the transfer and registration of the firearm" in the transferee's name. 26 U.S.C.

6  § 5812(a), (b). The new registration is then recorded in the National Record. *See*

7  27 C.F.R. § 479.101(b).

8  The Act makes it "unlawful for any person . . . to receive or possess a firearm"

9  that "is not registered to him in the [National Record]." 26 U.S.C. § 5861(d). Under

10 the Act, a firearm includes "any firearm muffler or firearm silencer," which is defined

11 as "any device for silencing, muffling, or diminishing the report of a portable firearm."

12 § 5845(a)(7); 18 U.S.C. § 921(a)(3)(C), (25). "In this context, the word 'report' refers

13 to the sound of a gunshot." *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 18 n.1

14 (D.D.C. 2014).

### III.    Discussion

**A.    *Bruen* changed the standard for evaluating firearm regulations under the Second Amendment.**

17 The Second Amendment provides that "the right of the people to keep and bear

18 arms, shall not be infringed." U.S. Const. amend. II. That right is not bestowed on the

19 people by the federal government; rather, the Second Amendment codified a pre-

existing "individual right to possess and carry weapons in case of confrontation."

*District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). This pre-existing right is not "a

second-class right, subject to an entirely different body of rules than the other Bill of

Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

Before *Bruen*, the Ninth Circuit joined other circuits in using a two-step test for

Second Amendment challenges. That test required courts to determine (1) "whether

the challenged law burdens conduct protected by the Second Amendment," and if so,

(2) whether the government could justify, under heightened scrutiny, the burden

imposed on a challenger's Second Amendment rights. *U.S. v. Chovan*, 735 F.3d 1127,

1136 (9th Cir. 2013). The second step's "heightened scrutiny" was usually

intermediate scrutiny, which requires "(1) the government's stated objective to be

significant, substantial, or important; and (2) a reasonable fit between the challenged

regulation and the asserted objective." *Id.* at 1138-39.

In *Bruen*, the Supreme Court emphatically rejected that two-step approach. *Id.*

at 2127. The Supreme Court instead adopted a "text-and-history standard" for

evaluating Second Amendment challenges. *Id.* at 2138. This standard's textual

component requires courts to answer a simple preliminary question—whether "the

Second Amendment's plain text covers an individual's conduct." *Id.* at 2126. If it does,

then "the Constitution presumptively protects that conduct." *Id.* The burden then

shifts to the government to rebut the presumption under the historical component. *Id.*

To do so, the government cannot follow the old playbook of showing that the challenged law promotes an important interest. *See id.* Instead, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only a law that is consistent with the Nation's historical tradition is constitutional under the Second Amendment. *Id.*

**B.     Silencers are protected by the Second Amendment, either explicitly or under the Amendment's implicit guarantees.**

Silencers are protected by the Second Amendment because they are "arms," or accessories to arms.[1] Even if they were not, silencers still fall within the scope of the Second Amendment's implicit guarantee because their use is indispensable to exercise the core Second Amendment right: the use of a gun for self-defense in the home.

**1.     Silencers are explicitly protected by the Second Amendment because they are "Arms" or accessories to "Arms."**

*Heller* defined "arms" as "weapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581. To "bear arms," in turn, means to "wear, bear, or carry . . . for the purpose of being armed and ready for offensive or defensive action in case of conflict with another person." *Id.* at 584 (ellipses in original).

---

[1] The Second Amendment's operative clause protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. Mr. Villalobos's status as one of "the people" is addressed in Section II.B. of his Memorandum in Support of the Motion to Dismiss Count One of the Indictment and is incorporated by reference here. ECF No. 90-1. Likewise, to "keep" means "to retain in one's . . . possession" under the Second Amendment. *Heller*, 554 U.S. at 582.

1    Silencers are used for an offensive purpose to the same degree as a firearm itself

2    because a bullet must pass through an attached silencer to arrive at its intended target.

3    Silencers are an integral part of a firearm, used to "cast . . . or strike" a bullet at

4    another person. *Id.* at 581. Thus, silencers are "[w]eapons of offence" protected by the

5    Second Amendment. *See id.* at 582; *but see U.S. v. McCartney*, 357 Fed. App'x. 73, 76

6    (9th Cir. 2009) (unpublished) (summarily concluding that silencers are not protected

7    by the Second Amendment). Federal law recognizes this fact by defining "firearms" to

8    include silencers. 26 U.S.C. § 5845(a)(7); 18 U.S.C. § 921(a)(3)(C).

9    Even if silencers were not protected arms in their own right, they are eligible for

10   Second Amendment protection as a modern-day analogue to the various firearm

11   accessories historically considered "arms" for Second Amendment purposes. At the

12   time of the founding, "arms" included the firearm itself and the "proper

13   accoutrements" that made it useful and functional. *U.S. v. Miller*, 307 U.S. 174, 182

14   (1939). In *Miller*, the Supreme Court surveyed founding-era state laws and explained

15   that many required militia members to carry such items as "ammunition," "one pound

16   of power," "twenty bullets," a box "contain[ing] not less than Twenty-four

17   Cartridges," a "proper Quantity of Powder and Ball," and "one pound of good

18   powder, and four pounds of lead, including twenty blind cartridges" in addition to a

19   "musket" or "rifle." *Id.* at 180-82. In fact, "[t]he possession of arms also implied the

possession of ammunition" when the Second Amendment was adopted. *Id.* at 180.

Memorandum in Support of Motion to Dismiss Count Ten

– 6 –

1    More recent historical research reveals that militiamen were required to carry

2    yet more items than *Miller* catalogued. Based on a survey of "founding-era" "militia

3    statutes," two Second Amendment scholars have concluded that "the arms and

4    accoutrements that Americans were required to possess" for militia service went well

5    beyond firearms and ammunition. David B. Kopel & Joseph G.S. Greenlee, *The Second*

6    *Amendment Rights of Young Adults*, 43 S. Ill. Univ. L.J. 495, 497 (2019). Those

7    additional accoutrements included "gun-cleaning equipment" such as brushes, wires,

8    and screw drivers; holsters and scabbards for "carrying and storage"; and items used

9    to keep firearms from decaying, such as a "cover" to "protect[] the gun lock from the

10   elements" and wax to "protect firearms from rain." *Id.* at 497, 521-23. These objects,

11   just as much as firearms themselves, are "necessarily part of the Second Amendment

12   right, since they are necessary to the use of arms." *Id.* at 511-12.

13   The Fourth Circuit has endorsed the view, reflected in Kopel and Greenlee's

14   article, that the Second Amendment must be read broadly to include all items

15   "necessary to the use of arms." As the court has explained, "[e]arly American

16   provisions protecting the right to 'arms' were also crafted partly in response to British

17   measures that, while not taking away guns entirely, drastically impaired their utility—

18   suggesting 'arms' should be read to protect all those items necessary to use the

19   weapons effectively." *Kolbe*, 813 F.3d at 175.

1       The Ninth Circuit has also endorsed this view, recognizing that "without

2    bullets, the right to bear arms would be meaningless. [Therefore, a] regulation

3    eliminating a person's ability to obtain or use ammunition could thereby make it

4    impossible to use firearms for their core purpose." *Jackson*, 746 F.3d at 967. This

5    "necessary to use" rule compels the conclusion that silencers are "arms" within the

6    Second Amendment's meaning because they improve the safety and efficacy of lawful

7    firearms use, as described below.

8       First, scientific research establishes that firearms generate sound pressure levels

9    that can permanently damage a user's hearing. The American Speech-Language-

10   Hearing Association recognizes that "[e]xposure to noise greater than 140 [decibels]

11   can permanently damage hearing,"[2] while the United States Occupational Safety and

12   Health Administration and the National Institute for Occupational Safety and Health

13   USA incorporate a peak limit of 140 decibels for occupational noise exposures.[3] "Peak

14   sound pressure levels . . . from firearms," meanwhile, "range from ~140 to 175

15   [decibels]"—well above the recommended thresholds.[4] As a result, exposure to

16

17   ———————————

18   [2] Michael Stewart, *Audiology Information Series: Recreational Firearm Noise Exposure,* Am. Speech-Language-Hearing Ass'n (2017), *available at* https://www.asha.org/siteassets/ais/ais-recreational-firearm-noise-exposure.pdf (last visited Jan. 4, 2023).

19   [3] 29 C.F.R. § 1910.95 (Table G-16 n.1).

[4] Deanna K. Meinke et al., *Prevention of Noise-Induced Hearing Loss from Recreational Firearms*, Semin Hear. 38(4): 267-81 (Nov. 2017).

1  gunfire, particularly over time, "not only lead[s] to hearing loss and tinnitus"—a

2  ringing in the ear that can become permanent—"but also contribute[s] to the

3  development of numerous other health issues, including sleep disturbance,

4  cardiovascular disease, and diabetes,"[5] as well as "stress, anxiety, high blood pressure,

5  gastro-intestinal problems, and chronic fatigue."[6]

6      Silencers are recognized as one of "several strategies [that] can be employed to

7  reduce the risk" of hearing damage and other health problems resulting from firearm

8  noise exposure.[7] The Centers for Disease Control, in two separate reports, has

9  recommended the use of silencers to reduce the unacceptably high levels of noise

10  exposure at shooting ranges.[8] "Modern muzzle-level suppression," one study

---

[5] Jay M. Bhatt et al., *Epidemiology of Firearm and Other Noise Exposures in the United States*, Laryngoscope, 127:E340-E346 (March 2017).

[6] Chucri A. Kardous, MS, PE, *Solutions for Preventing Lead Poisoning and Hearing Loss at Indoor Firing Ranges*, cdc.gov (May 2009), https://blogs.cdc.gov/niosh-science-blog/2009/05/18/firingrange/ (last visited Jan. 4, 2023); *see also* U.S. Dep't of Veterans Affs., Veterans Health Admin.: Off. of Rsch. and Dev., *Fact Sheet: VA Research on Hearing Loss* 1 (Aug. 2021), *available at* https://www.research.va.gov/pubs/docs/va_factsheets/HearingLoss.pdf (last visited Jan. 4, 2023) ("Hearing problems – including tinnitus . . . – are by far the most prevalent service connected disability among American Veterans.").

[7] Michael Stewart et al., *National Hearing Conservation Association Position Statement: Recreational Firearm Noise* 1 (March 2017), *available at* https://www.hearingconservation.org/assets/docs/NHCA_position_paper_on_firea.pdf (last visited Jan. 4, 2023); *see also* Ronald Turk, *White Paper: Options to Reduce or Modify Firearms Regulations* 6 (Jan. 2017), *available at* https://shared.nrapvf.org/sharedmedia/1509466/atf-white-paper-options-to-reduce-or-modify.pdf (last visited Jan. 4, 2023) ("[Silencers'] use to reduce noise at shooting ranges and applications within the sporting and hunting industry are now well recognized.").

[8] Brueck SE, et al., Nat'l Inst. for Occupational Safety and Health (NIOSH), *Health Hazard Evaluation Report: Measurement of Exposure to Impulsive Noise at Indoor and Outdoor Firing Ranges During Tactical Training Exercises* 14, HHE Report 2013-0124-3208, *available at* https://www.cdc.gov/niosh/hhe/reports/pdfs/2013-0124-3208.pdf (last visited Jan. 4, 2023) ("If feasible and legally permissible, attach noise suppressors to firearms to reduce peak sound pressure

1    concluded, is "the *only available form of suppression* capable of making certain sporting

2    arms safe for hearing."[9] A firearm owner cannot use his weapon for self-defense in the

3    home if to do so exposes him to serious and long-term health consequences.

4        Second, silencers improve firearm owners' ability to practice self-defense in

5    other ways. Silencers can improve accuracy by reducing recoil and "muzzle rise,"

6    which is the barrel's tendency to move up when the gun is fired.[10] They also can reduce

7    hearing loss and disorientation immediately after firing, providing a victim additional

8    time to defend against an attack.[11]

9        Like gun-cleaning equipment, holsters, and items that protect firearms from the

10   elements—all of which were considered "Arms" at the founding—silencers are

11   necessary to use weapons effectively. Thus, this Court should conclude that silencers

12   are "arms" within the scope of the Second Amendment's plain text.

---

levels."); Lilia Chen, MS, CIH, et al., NIOSH, *Noise and Lead Exposures at an Outdoor Firing Range – California* 5, NIOSH HETA No. 2011-0069-3140 (Sept. 2011), *available at* https://www.cdc.gov/niosh/hhe/reports/pdfs/2011-0069-3140.pdf (last visited Jan. 4, 2023) ("The *only* potentially effective noise control method to reduce students' or instructors' noise exposure from gunfire is through the use of noise suppressors that can be attached to the end of the gun barrel." (emphasis added)).

[9] Matthew Parker Branch, M.D., *Comparison of Muzzle Suppression and Ear-Level Hearing Protection in Firearm Use*, Otolaryngology – Head and Neck Surgery, 144(6):950-53 (Feb. 2011) (emphasis added).

[10] Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 Cumb. L. Rev. 33, 69 (2016).

[11] A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense*, 97 Marq. L. Rev. 853, 892 n.221 (2014).

**2.        Alternatively, silencers are implicitly protected by the Second Amendment because they are indispensable to effective enjoyment of the right to armed self-defense.**

Like all enumerated constitutional provisions, the Second Amendment contains both explicit and implicit guarantees. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 579 (1980) ("[T]he Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees.").[12] If an unarticulated right is "indispensable to the enjoyment of [a] right[] explicitly defined," it will "share constitutional protection in common with [the] explicit guarantee[]." *Id.* at 580.

The Ninth Circuit has already applied this principle to Second Amendment claims. In *Jackson*, the plaintiffs challenged a local ordinance prohibiting the sale (but not possession) of hollow point ammunition. 746 F.3d at 958. The Ninth Circuit held that the ordinance regulated conduct within the scope of the Second Amendment because "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Id.* at 967 (quotation marks omitted). If a gun owner cannot purchase the bullets he needs to exercise his right to self-defense, it doesn't matter that he is allowed to possess the gun he would use to do so. A

---

[12] While *Richmond Newspapers* is a First Amendment case, the Supreme Court has analogized to the First Amendment when interpreting and applying the Second Amendment. *See Bruen*, 142 S. Ct. at 2130 ("[*Bruen*'s] Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms."). The Ninth Circuit has done the same. *See Jackson* 746 F.3d at 967 (analogizing to the First Amendment to find that a regulation preventing a person from exercising a Second Amendment right in San Francisco constitutes an injury in fact).

prohibition on selling ammunition therefore falls within "the historical understanding of the scope of the Second Amendment right." *Id.* at 968.

Likewise, the Seventh Circuit held in *Ezell v. City of Chicago* that a Chicago ordinance prohibiting private citizens from using shooting ranges within city limits regulated conduct within the scope of the Second Amendment because "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective." 651 F.3d 684, 704 (7th Cir. 2011). The Fourth Circuit also recognized in *Kolbe* that "to the extent that firearms equipped with detachable magazines are commonly possessed" for self-defense purposes and thus protected by the Second Amendment, "there must also be an ancillary right to possess the magazines necessary to render those firearms operable." 813 F.3d at 175.

The same logic applies here. As explained above, using silencers improves accuracy, reduces disorientation after firing, and helps prevent substantial and irreversible damage to users' health. If, as *Heller* holds, the Second Amendment protects the right to use a gun for self-defense in the home, it must also protect the "corresponding right" to do so without incurring serious health risks. *Jackson*, 746 F.3d at 967. Regulation of the possession of silencers therefore imposes a burden on conduct falling within the scope of the Second Amendment's guarantee.

**C.      Section 5861(d) violates the Second Amendment because there is no historical tradition of requiring registration of "Arms" or their accessories in the founding era.**

Because the Second Amendment applies, "the Constitution presumptively protects [Mr. Villalobos's] conduct." *Bruen*, 142 S. Ct. at 2126. To rebut this presumption, the government must establish that § 5861(d) "is consistent with this Nation's historical tradition of firearm regulation." *Id.* The government cannot carry its burden because registration requirements for "Arms" did not become law until the 20th century.

**1.      *Bruen* set forth a two-track analysis under its historical component.**

In *Bruen*, the Supreme Court explained the standard for reviewing historical evidence depends on what kind of problem a statute is intended to address—specifically, whether that problem is old or new. *Id.* at 2131-32. Old problems are "general societal problems that ha[ve] persisted since the 18th century." *Id.* at 2131. In contrast, new problems are those involving "unprecedented societal concerns or dramatic technological changes" that were "unimaginable at the founding." *Id.* at 2132. Therefore, courts faced with a Second Amendment challenge must identify the problem at which the law was aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes." *Id.* at 2132. Only then will the court know which approach to employ.

1    When the challenged law addresses an old problem, the test is "fairly

2 straightforward"; the government must identify a tradition of "distinctly similar" laws

3 from the founding era. *Id.* Although *Bruen* did not expressly define "distinctly

4 similar," it indicated the standard is a stringent one. The only historical regulation

5 *Bruen* identified as sufficiently similar to New York's proper-cause requirement was an

6 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol

7 . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Id.*

8 at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was

9 essentially identical to New York courts' interpretation of that state's proper-cause

10 standard. *See id.* at 2123-24.

11    *Bruen* also noted that "*Heller* . . . exemplifies th[e] kind of straightforward

12 historical inquiry" demanded by the "distinctly similar" test. *Id.* at 2131. *Heller*

13 confirms that the standard is a strict one. When assessing the "total[] ban[]" on

14 handgun possession at issue in *Heller*, the Supreme Court identified only two historical

15 laws for comparison: a Georgia law and a Tennessee law, both of which prohibited the

16 open carry of pistols. 554 U.S. at 628-29. *Bruen* and *Heller* both show that the focus of

17 the "distinctly similar" test is on historical laws that are virtually identical to the

18 modern law.

19    When the challenged law addresses a new problem, the test is "more nuanced."

*Bruen*, 142. S. Ct. at 2132. Courts must determine if the challenged modern law fits into

Memorandum in Support of Motion to Dismiss Count Ten

– 14 –

a "relevantly similar" tradition of historical laws. *Id.* The Supreme Court identified two "central considerations" for courts to determine if laws are relevantly similar: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.

The "relevantly similar" test is less difficult for the government to satisfy because it allows for "analogical reasoning." *Id.* at 2132. But courts may use this test only when the challenged law is aimed at a societal problem that was "unimaginable at the founding." *Id.* It is not available when the challenged law addresses an old problem—that is, one which "has persisted since the 18th century." *Id.* at 2131. When a law addresses an old problem, it must satisfy the stringent "distinctly similar" test; there must be a historical tradition of laws that are virtually identical to the modern law. *Id.* at 2153; *Heller*, 554 U.S. at 628-29.

Regardless of whether the case calls for the stringent "distinctly similar" or the looser "relevantly similar" test, the relevant "historical tradition" is that which existed when the Second Amendment was ratified in 1791. *Bruen*, 142 S. Ct. at 2136. That is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them.*" *Id.* (emphasis in original). Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but should do so with care. *Id.* at 2131-32. *Bruen* cautioned that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the

Memorandum in Support of Motion to Dismiss Count Ten
– 15 –

[Second Amendment] right if linguistic or legal conventions changed in the intervening years." *Id.* at 2136. Courts should not rely on practices "that had become obsolete in England at the time of the adoption of the Constitution and never [were] acted upon or accepted in the colonies." *Id.*

Likewise, courts must not "giv[e] postenactment history more weight than it can rightly bear." *Id.* While evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation," historical evidence becomes less probative the farther forward in time one goes from 1791. *Id.* at 2136-37. The Court recognized that "discussions of the right to keep and bear arms" that took place after the Civil War provided less insight into the Second Amendment's original meaning than earlier sources because they took place 75 years after its ratification. *Id.* at 2137. Courts therefore should credit such later history to the extent it is consistent with prior practice but should otherwise afford it little weight. *See id.* After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" because it is too far removed from 1791).

Furthermore, the comparable tradition of regulation must be "well-established and representative." *Id.* at 2133; *see also id.* at 2137 (explaining that "a governmental

Memorandum in Support of Motion to Dismiss Count Ten
– 16 –

practice" can guide [courts'] interpretation of an ambiguous constitutional provision" only if that practice "has been open, widespread, and unchallenged since the early days of the Republic."). A handful of 'outlier[]" statutes or cases from a small number of "outlier jurisdictions" are not enough to establish a historical tradition. *Id.* at 2153, 2156. For instance, the Supreme Court doubted laws from three of the thirteen original colonies were enough to show a relevant tradition. *See id.* at 2142.

Finally, *Bruen* emphasized that "the burden falls on [the government] to show that [a law] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. Consistent with "the principle of party presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. Accordingly, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." *Id.* at 2150. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11; *see also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend" a law).

> **2.      Under either the stringent "distinctly similar" test or the looser "relevantly similar" test, the government will be unable to carry its burden.**

As an initial matter, the government must identify the "general societal problem" § 5861(d) is intended to address. *Id.* at 2131. This determines which test the

Memorandum in Support of Motion to Dismiss Count Ten
– 17 –

1   government must satisfy: the stringent "distinctly similar" test or the less stringent

2   "relevantly similar" test. *Id.* at 2131-32. Under either test, the government cannot

3   carry its burden because "the people" were not required to register their "Arms" with

4   the government as a prerequisite to lawful possession until the 20th century.

5        The first registration law to take effect was in New York in 1911.[13] That statute

6   required sellers of concealable firearms to "keep a register in which shall be entered at

7   the time of sale" certain identifying information about the transaction and the

8   purchaser, along with the "calibre [*sic*], make, model, manufacturer's number or other

9   mark of identification" on the firearm.[14] If the purchaser later transferred the firearm

10  to another person without "first notifying the police authorities," he or she would be

11  guilty of a misdemeanor.[15] By the time the federal Act was enacted in 1934, nine states

12  had followed New York's lead and enacted registration statutes.[16]These statutes are

13  insufficient to discharge the government's burden for at least three reasons.

14  _____

    [13] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of
    Dangerous Weapons, ch. 195, § 2 (Ex. A).

15  [14] *Id.*

16  [15] *Id.*

17  [16] 1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns,
    Pistols, Other Fire-Arms and Silencers for Fire-Arms and Providing a Penalty for Violation, § 1
    (Ex. B); 1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession,
18  sale or other disposition of firearms capable of being concealed upon the person § 7 (Ex. C); 1917
    Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of
    any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and
19  regulating the carrying and sale of certain firearms, and defining the duties of certain executive
    officers, and providing penalties for violation of the provisions of this Act, § 5 (Ex. D); 1931 Ill.
    Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4
    (Ex. E); 1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain

*First*, these statutes appear to be "outliers." *Bruen*, 142 S. Ct. at 2153. At most, ten states passed registration statutes before the federal Act was passed. The Court in *Bruen* "doubt[ed]" that statutes from three of the original thirteen colonies—or roughly 23 percent—"could suffice to show a tradition" of relevant firearm regulation. *Id.* at 2142. Ten states out of the 48 admitted to the Union as of 1934 makes up 21 percent of the total, which is roughly the same as the proportion rejected in *Bruen*. These few registration statutes, therefore, are not "representative" in the way *Bruen* demands. *Id.* at 2133.

*Second*, these statutes almost exclusively address different problems from the "general societal problem" that § 5861(d) may target. Despite the fact that silencers were in common enough use in 1913 for Michigan to require their registration, only the Michigan statute required the registration of silencers. The others required registration of different types of firearms, such as machineguns or guns that could be concealed on the person.[17] Whatever purpose a silencer-registration requirement serves, it is not the

---

Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4 (Ex. F); 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8 (Ex. G); 1931-1933 Wis. Sess. Laws 245-47, An Act . . . Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06 (Ex. H); 1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3 (Ex. I); 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7 (Ex. J).

[17] *See supra* notes 13 & 16, and sources cited therein.

Memorandum in Support of Motion to Dismiss Count Ten
– 19 –

same purpose served by requiring registration of fully automatic machineguns. These statutes therefore are not "relevantly similar" to § 5861(d). *Id.* at 2132.

*Third*, and most importantly, none of these statutes was enacted in the period *Bruen* deems crucial—the years immediately surrounding the founding. The earliest of these statutes was enacted in 1911, which postdates the Second Amendment's ratification by 120 years. Such recent evidence is irrelevant to the Second Amendment analysis unless it "confirm[s]" what earlier sources have already established, *id.* at 2137, which is not the case here. Indeed, the Court in *Bruen* declined even to "address any of the 20th-century historical evidence brought to bear" because it "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id* at 2154 n.28. The same is true of the registration statutes identified above. Thus, there is no "comparable tradition of regulation" from the founding era. *Id.* at 2132.

Unless the government can bring forward additional historical evidence of which Mr. Villalobos is unaware, it will be unable to establish a broad historical tradition of requiring registration of "Arms," including firearm silencers. Section 5861(d) therefore violates the Second Amendment.

### IV.   Conclusion

For the reasons described above, the Court should dismiss Count Ten of the indictment against Mr. Villalobos.

Dated: January 20, 2023.

Federal Defenders of Eastern Washington & Idaho
Attorneys for Manuel P. Villalobos

s/Ryan M. Farrell
Ryan M. Farrell, WSBA #58863
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
ryan_farrell@fd.org

Service Certificate

I certify that on January 20, 2023, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF System, which will notify Assistant United

States Attorneys: Bryce Ellsworth, David Robins, and Justin Whatcott.

s/Ryan M. Farrell
Ryan M. Farrell, WSBA #58863
10 North Post Street, Suite 700
Spokane, Washington 99201
t: (509) 624-7606
f: (509) 747-3539
ryan_farrell@fd.org