UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:19-cr-00040-DCN |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| MANUEL PHILLIP VILLALOBOS, | |
| Defendant. | |

## I. INTRODUCTION

Pending before the Court are numerous motions filed by Defendant Manuel Villalobos. The Court will address some of these motions today in preparation for the upcoming April 11, 2023 hearing. Specifically, the Court will briefly address Villalobos's Motion for Discovery (Dkt. 89) and will address, in large part, Villalobos's Motion to Suppress for *Franks* Violations (Dkt. 90).[1] It will not address the two Motions to Dismiss (Dkts. 90, 91) at this time, but will allow oral argument on the same at the upcoming hearing.

In his Motion for Discovery, Villalobos ask the Court to compel the Government to reveal whether any informants were involved in his case. *See generally* Dkt. 89. The Government replied that "no confidential informants [were] utilized in this case." Dkt. 100.

---

[1] Because his brief in support of this motion is 24 pages in length (four pages over the limit set by local rule), Villalobos filed a Motion for Leave to File Excess Pages. Dkt. 94. The Government has not filed a response to the motion. Good cause appearing, the motion for excess pages is GRANTED. The Court accepts the overlength brief (Dkt. 92) as submitted.

Accordingly, Villalobos's Motion for Discovery is granted to the extent that the Government has already disclosed the information he seeks: whether informants played a role in this case.

In his Motion to Suppress, Villalobos asks for two things: (1) a *Franks* hearing[2] to challenge the veracity of the warrant affidavit, and (2) the suppression of all evidence seized from the resulting search. After reviewing the briefing and the record, the Court finds that a *Franks* hearing is not warranted, so the Motion is DENIED in PART as it relates to that request. The remainder of the Motion remains under consideration. The Court will hear any remaining argument on the matter at the hearing on April 11, 2023. That hearing, however, will not be a *Franks* hearing and may not include any testimony or challenges to the veracity of the affidavit filed in support of obtaining the warrant.

## II. BACKGROUND

### A. Factual Background

Manuel "Manny" Villalobos is a registered member of the Nez Perce Indian Tribe. In 2015, Villalobos moved into a residence owned by his father. The residence is in a remote, unincorporated community in Nez Perce County called Lenore. Lenore is located on the Nez Perce Idaho reservation. Shortly after Villalobos moved in, his father and stepmother, Bobbi Ann, moved into an apartment in Lewiston, Idaho. Bobbi Ann later told law enforcement they moved out of the Lenore home because of "issues" with Villalobos.

---

[2] As will be explained below, *see infra* Section III, a "*Franks*" hearing is a specific type of hearing in which a Defendant challenges the underlying information provided in an affidavit for a warrant. This procedure stems from *Franks v. Delaware*, 438 U.S. 154 (1978).

In December of 2017, Villalobos's father passed away. His father's belongings, including a large collection of firearms, remained at the residence in Lenore. On March 16, 2018, Villalobos posted a series of messages to his Facebook page, including the following:







**Manny Villalobos III** added 2 new photos.
Friday at 4:08 PM · 🌐

So I don't sound like a nut, they want this ledger so bad, they can taste it. I noticed you assholes, because there is no one else out here. People fishing without fishing poles? Fish ain't running, they just been clocking me.



**Manny Villalobos III**
Friday at 4:25 PM · 🌐

My other craft will be needed too. Quite the operation? KIll zone, choke point, kill zone, and then 1st responder.  Theyll wait till the darkest part of night I expect.





Sometime thereafter, Bobbi Ann contacted the Lewiston Police Department and told officers about Villalobos's Facebook posts; particularly the first post regarding "the will" believing it was directed at her. She told law enforcement that Villalobos believed *she* murdered his father and that he had a large cache of firearms at the residence.

On April 3, 2018, Sergeant Jason Leavitt of the Lewiston Police Department

contacted the FBI and relayed that a "concerned citizen reported her step-son was threatening her." Dkt. 92-2, at 3. Leavitt noted Villalobos was prohibited from possessing a firearm because of a prior felony conviction and that he was referring the matter to the FBI because: (1) Villalobos is an enrolled member of the Nez Perce Tribe, and (2) he lived on the Nez Perce Indian Reservation. *Id*. at 5. On April 9, 2018, the FBI opened an investigation into Villalobos for illegally possessing a firearm.

On September 16, 2018, Nez Perce County Sheriff's officers responded to a call for assistance at Villalobos's home.[3] Importantly, it was Villalobos who called law enforcement. When officers arrived, Villalobos met them in his front yard with an AK-47 style rifle slung over his shoulder. Officers asked him to place the rifle on the ground. He willingly complied before they could even finish their request. Villalobos then explained that unknown persons had trespassed on his property and left items—including a bomb and red phosphorous—with the intent to kill him and/or burn his house down. He said the people had "green eyes," as if they were wearing night-vision goggles. Officers addressed Villalobos's concerns and left. The incident was reported to the FBI.

FBI Special Agent Trevor Hare began investigating whether Villalobos was prohibited from possessing firearms. He eventually determined that Villalobos was indeed prohibited due to a 1994 felony conviction for burglary. Agent Hare also reviewed Villalobos's social media profiles. In addition to the Facebook messages already noted above, Agent Hare found a picture of Villalobos holding a pistol with a silencer attached

---

[3] Nez Perce Tribal Police also responded to the scene.

to it and the caption "I know you're not talking to me."

The investigation continued. Agent Hare began working with the bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to identify the origins of the weapons Villalobos possessed. He also received numerous tips from Nez Perce Tribal Police about Villalobos and his behavior. These reports included testimony from people who knew Villalobos. One said he moved away from Villalobos because of his erratic activity. Another—Villalobos's nephew—said he and his girlfriend moved out of the Lenore residence because Villalobos threatened to shoot them with his AK-47. Dkt. 92-2, at 7–8.

On January 28, 2019, Nez Perce Fisheries employees responded to a faulty well pump next to Villalobos's property. To access the well, the employees drove down Villalobos's driveway. Over the course of the day, they made four trips to the well. On the first trip, one of the employees, who knew Villalobos, greeted him. Villalobos nodded in response. Notably, Villalobos was carrying his AK-47 rifle with two magazines taped together and inserted into the magazine well. On the second trip, the workers saw Villalobos holding his rifle in a horizontal position near his house. Villalobos then approached the pump and asked what the employees were doing. They responded that they were working on the well, to which Villalobos did not reply. On the third trip, Villalobos was not seen. On the final trip, the employees observed Villalobos hiding behind a tree watching them. It did not appear that he had his rifle with him at that time. These individuals reported the event to law enforcement and stated Villalobos's behavior alarmed them and that they were concerned for their safety. Dkt. 92-6, at 4–5.

For some time, agents watched Villalobos's house. They saw spray painted

messages on one side of the house with the words "EPA Gold Leeching" and a hand gesturing the middle finger. Another side of the home had the phrase "RIP CLEARWATER" spray painted on it.

Based on all the information gleaned during the investigation, Agent Hare sought a federal search warrant allowing him to search the Lenore residence and seize all firearms illegally possessed by Villalobos. Critically, the warrant application sought approval for a "no-knock" warrant because Villalobos "commonly carries an assault rifle with him, has threatened to kill acquaintances with said firearm, and has made threats to shoot authority figures coming on his property." Dkt. 92-2, at 10. Agent Hare explained that Villalobos "claims to have measured shooting distances and placed windage flags on his property, and to have placed guns in vantage points with the intent of shooting authority figures." *Id*. Considering these facts, it was Agent Hare's opinion that "allowing a tactical team to make a no-knock entry will prevent Villalobos the ability to gain tactical advantage while officers are outside announcing their presence" and would be paramount "to the safety of Agents and officers in the execution of the search warrant." *Id*. On February 5, 2019, United States Magistrate Judge Ronald E. Bush approved the warrant.

Shortly after 6:00 a.m. on the morning of February 7, 2019, an FBI SWAT team served the warrant at the residence in Lenore. As agents approached the back deck of the house, they noticed a female occupant through the kitchen window. Because this woman, later identified as Marjorie Eccles, had seen the SWAT team, the agents decided to announce rather than proceed with the no-knock plan. Agents began yelling "FBI" and

MEMORANDUM DECISION AND ORDER – 9

"Police."[4] Eccles raised her hands in the air so they were visible to the agents. She then retreated into the house.

As agents began battering the back door with a ram, Villalobos fired as many as ten shots through the door. Two bullets struck Special Agent Draper, one in the upper left arm and one in the left hip. No other officers were hit by gunfire. The agents did not return fire. Instead, they breached the door and arrested Villalobos. As he was coming out of the residence Villalobos said, "I'm sorry I shot at you guys. I'm sorry I shot at you guys. I thought you were the bad guys. Are you guys ok?" Dkt. 92-9, at 2.

## B. Procedural History

Villalobos was originally charged via a Criminal Complaint filed on February 7, 2019. Dkt. 1. The stated offense was felon in possession (18 U.S.C. 922(g)(1) and 924(a)(2). *Id.* The following week, on February 13, 2019, a grand jury indicted Villalobos on the same charge. Dkt. 11.

On July 10, 2019, the grand jury returned a superseding indictment that added four charges of Assault upon a Federal Officer, four counts of Use of a Firearm During and in Relation to a Crime of Violence (one for each of the assault counts), and a charge for possessing a silencer.

On August 14, 2019, another superseding indictment was issued. Dkt. 28. The charges remained the same. That document stands as the operative indictment.

---

[4] Villalobos disputes this, claiming that officers "did not announce their presence." Dkt. 92, at 10. Though it is a disputed fact that can be fleshed out at a hearing or during trial, this discrepancy is immaterial to the Court's decision today, which relates only to whether a *Franks* hearing is warranted.

On February 21, 2020, Villalobos's Counsel filed a Motion for Competency Determination. Dkt. 40. Thus began a multi-year endeavor to determine if Villalobos was competent to proceed to trial. The Court has reviewed this history in extensive detail in its prior decision (Dkt. 74, at 2–12) and provides only short recitation here for context.

Villalobos's Counsel's original motion was based on a forensic psychological evaluation performed by Doctor Karen Franklin. Dr. Franklin determined that, while Villalobos seems excited about the prospect of going to trial and has a "basic factual understanding regarding the proceedings against him," he also suffers from paranoid and grandiose delusions, and these interfere with his competency to stand trial. Dkt. 41, at 18–19. In her opinion, Villalobos lacked the capacity to proceed to trial.

In response, the Government asked that the Court allow a forensic psychiatrist of its choosing an opportunity to evaluate Villalobos. Dkt. 43. The Court granted the Government's request and set a hearing to determine competency. Dkts. 45, 46.

The Government's psychiatrist likewise found that Villalobos was suffering from a mental disorder or disease that would impair his ability to proceed to trial. Dkt. 49. He recommend "formal competency restoration procedures" at FMC-Butner (the Bureau of Prison's medical center). *Id*. at 16.

After a hearing in October 2020 (Dkt. 51), the Court found Villalobos incompetent to proceed to trial and ordered he be committed at FMC-Butner for the purpose of undergoing restorative treatment. Dkt. 52.

Almost one year later, the Court received an evaluation from FMC-Butner outlining the restorative treatment Villalobos had undergone. In that clinician's opinion, Villalobos

has a mental condition that rendered him incompetent to proceed to trial. That said, the evaluator stated Villalobos could be "restored" with the aid of antipsychotic medicine. Because Villalobos had, thus far, refused medication, the recommendation was that he be giving psychotropic medication on an involuntary basis. To go about this—involuntary medicating a defendant—the Court was required to hold a *Sell*[5] hearing. The Government so moved. Dkt. 59. After said hearing on January 27, 2022, the Court determined it was appropriate to involuntarily medicate Villalobos with antipsychotic medications. Dkt. 74. Over the next several months, staff at FMC-Butner filed reports with the Court regarding Villalobos's status. Ultimately, the assigned clinical staff determined that, as a result of appropriate medication and extensive programming, Villalobos's competency was restored and he was able to understand these proceedings and aid in his own defense. Dkt. 81 at 17. Critically, that opinion was based upon a continued and consistent medication regimen. *Id*. Staff warned that if there was any disruption in Villalobos's medication, his mental condition could become compromised. *Id*.

Upon Villalobos's return to Idaho, the Court held another competency hearing. Dkts. 84, 85. The Court found Villalobos competent to stand trial. Dkt. 85. The Court set a trial date and associated deadlines. Those deadlines were then continued by stipulation of the parties. Dkt. 96. Trial is currently set for August 28, 2023. Dkt. 96. In preparation for trial, Villalobos filed the motions now at issue.

As noted, the primary issue today is whether to hold a *Franks* hearing as part of, or

---

[5] *See Sell v. United States*, 539 U.S. 166 (2003).

in conjunction with, a hearing on Villalobos's request to suppress all evidence seized after the execution of the warrant on February 7, 2019. Villalobos contends that, because of errors in the underlying warrant affidavit, the subsequent search was illegal, and the evidence seized must be suppressed. The Government opposes both the request to hold a *Franks* hearing, and the request that evidence gleaned from the search be suppressed.

## III. LEGAL STANDARD

At a *Franks* hearing, a defendant may challenge the veracity of an affidavit underlying a search warrant. *Franks*, 438 U.S. at 155–56. In *Franks*, the Supreme Court held that the Fourth Amendment requires an evidentiary hearing if "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Id*. "Allegations of negligence or innocent mistake are insufficient." *Id.* at 171. Furthermore, conclusory "allegations of deliberate falsehood or of reckless disregard for the truth" are also not enough; rather, the allegations of deliberateness or recklessness "must be accompanied by an offer of proof." *Id.* at 171. In order to obtain a *Franks* hearing, the defendant's motion must meet five requirements:

> (1) [T]he defendant must allege specifically which portions of the warrant affidavit are claimed to be false; (2) the defendant must contend that the false statements or omissions were deliberately or recklessly made; (3) a detailed offer of proof, including affidavits, must accompany the allegations, (4) the veracity of only the affiant must be challenged; and (5) the challenged statements must be necessary to find probable cause.

*United States v. Dicesare*, 765 F.2d 890, 894–95 (9th Cir. 1985).

Affidavits are presumed valid. Accordingly, the burden of showing otherwise is high. *Franks*, 438 U.S. at 171. The Supreme Court requires a *substantial* showing from the defendant, in part, because "if such hearings were conducted routinely . . . , they would be misused by defendants as a convenient source of discovery." *Id.* at 167.

Even if the defendant makes a substantial showing "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included [in the affidavit]," a hearing still may not be required. *Id.* at 155, 171–72. "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171–72.

Probable cause for a search warrant exists where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The probable-cause showing is different for search warrants than for arrest warrants:

> [W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

*Steagald v. United States*, 451 U.S. 204, 212–13 (1981).

# IV. ANALYSIS

The Fourth Amendment and 18 U.S.C. § 3109 both mandate that police officers entering a dwelling pursuant to a search warrant announce their purpose and authority and either wait a reasonable amount of time or be refused admittance before forcibly entering the residence. *See Wilson v. Arkansas,* 514 U.S. 927, 933–35 (1995). This is commonly referred to as the "knock and announce" rule and may only be excused by the presence of exigent circumstances. *Richards v. Wisconsin,* 520 U.S. 385, 394–95 (1997). Exigent circumstances exist when officers have a "reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards,* 520 U.S. at 394. "This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." *Id.* at 394–95. In each case, any one factor analyzed under the totality of the circumstances may be sufficient to justify dispensing with the knock and announce requirement. *Peterson*, 353 F.3d at 1050 n. 5. The United States Supreme Court has emphasized that "reasonableness [is] a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case[.]" *United States v. Banks,* 540 U.S. 31, 36 (2003).

Here, Villalobos contends no exigent circumstances existed justifying a no-knock warrant. He argues that, had Judge Bush not been misled by Special Agent Hare, he never would have signed off on that provision in the warrant. After careful review, the Court finds that Villalobos has not substantially shown that Agent Hare intentionally or recklessly

included false statements in his affidavit. For those reasons, the Court DENIES the request for a *Franks* hearing.

To reiterate, Villalobos does not challenge the warrant as a whole. Likewise, he does not attack Agent Hare's entire affidavit. His focus is on the "no-knock" aspect contained in the warrant and, therefore, the information Agent Hare provided to support that unique provision.

Villalobos argues three instances support a finding that Agent Hare misrepresented, or omitted, factual information in order to obtain Judge Bush's approval of the no-knock warrant:

1) Agent Hare misrepresented that Villalobos had made "threats to shoot authority figures coming on his property" and that he had "placed guns in vantage points with the intent of shooting authority figures." Dkt. 92, at 16.

2) Agent Hare failed to inform the Court that one of the Nez Perce Tribal Fishery Employees knew Villalobos, that Villalobos did not verbally threaten the employees, and that during their last visit to the pump, Villalobos did not possess a firearm. *Id*. at 21.

3) Agent Hare omitted that on September 28, 2018, it was Villalobos who requested law enforcement respond to his home and his interactions with them were calm. *Id*.

Before addressing these arguments, the Court will discuss two broad themes raised by the Government in opposing Villalobos's motion.

The Government begins its opposition by stating that alleged violations of the

knock-and-announce rule cannot result in suppression. Citing the Fourth Amendment, common law tradition, and 18 U.S.C. § 3109, the Government argues that all three are silent as to available remedies for violations. The Government moves on to Supreme Court cases that found the exclusionary rule does not apply to knock-and-announce violations under the Fourth Amendment or § 3109 arguing suppression is not available under such circumstances. Finally, the Government reaffirms that the Ninth Circuit has also held— albeit in an unpublished decision—that "[s]uppression of evidence is not an available remedy for violations of the 'knock and announce' rule under 18 U.S.C. § 3109." *United States v. Ramirez*, 196 Fed. App'x. 538, 539 (9th Cir. 2006) (unpublished) (citing *Hudson v. Michigan*, 547 U.S. 586 (2006)).[6] The Government contends Villalobos might have a remedy via a *Bivens* claim or some other mechanism, but not via suppression.[7]

Second, the Government argues that even if the no-knock warrant had been improperly issued, it was never executed because law enforcement announced their presence after observing that Marjorie Eccles saw them approaching.[8]

---

[6] Villalobos tries to distinguish *Hudson*—the leading Supreme Court case on this issue—by claiming the unique facts here lead to a different outcome. Dkt. 102, at 4, 6 n.1. Villalobos's argument, however, appears to find a distinction where there is none. The Court will not dissect that argument further, nor will it address the applicability of the exclusionary rule to § 3109 violations, because, as will be explained below, this is an unsettled area of law and it reaches the same outcome (that a *Franks* hearing is not required) under the facts and substantive arguments.

[7] In a similar vein, the Government questions whether Villalobos can even challenge "part" of a warrant via *Franks*. It argues a *Franks* hearing is permitted only when challenging a finding of probable cause for the warrant itself (i.e., the "whole" thing). Since Villalobos is not challenging the probable cause for the overall issuance of the warrant, the Government argues his motion is misplaced. Again, the Court understands the Government's position, but will not definitively rule on that question today.

[8] The Government adds that even if they had not announced themselves, another reason they would have been allowed to enter unannounced is because Villalobos fired upon officers. It explains that once that "intervening event" happened, officers had "ample exigency justification to enter [the home] [in order to]

Both arguments are persuasive. First, precedent is not on Villalobos's side when it comes to suppression as a remedy for knock-and-announce violations. The Fifth Circuit, the Second Circuit, and the D.C. Circuit have all held that the exclusionary rule is *inapplicable* to § 3109 violations. *See, e.g., United States v. Acosta*, 502 F.3d 54, 60 (2d Cir. 2007) (collecting cases). That said, as the Sixth Circuit has observed, this is not a settled area of law and there is still "room for disagreement regarding whether the exclusionary rule should remain available as a remedy for violations of § 3109." *United States v. Ferguson*, 252 F. App'x 714, 719 (6th Cir. 2007). And critically, the Ninth Circuit has not formally ruled on the matter.[9]

Second, while Villalobos contends (in attorney briefing) that officers never announced themselves, there is other record evidence supporting the Government's position that officer *did* announce their presence prior to breaching the door. *See, e.g.,* Dkt. 92-2 (Agent Hare's FBI report of the events that transpired on February 7, 2019). This lends itself to the conclusion that the execution of the warrant was a knock-and-announce situation as opposed to a no-knock situation.

The Court elects not to wade into the murky legal waters of whether the exclusionary rule allows for suppression of knock-and-announce violations under § 3109, or the less murky water of whether law enforcement's actions should be considered "no-knock" in

---

extinguish and address the lethal threat" separate and apart from the requirements or parameters of the warrant. Dkt. 98, at 20. Again, this argument is persuasive, but not dispositive of the issues before the Court.

[9] As noted, there is an unpublished decision that summarily states "suppression of evidence is not an available remedy for violations of . . . § 3109." *Ramirez*, 196 Fed. Appx. at 539.

this case.[10] The Court declines to do so because it does not need to. There was sufficient evidence to support Agent Hare's representations in his affidavit. Thus, these looming procedural questions notwithstanding, the Court need not engage in a *Franks* hearing for the simple reason that Agent Hare's affidavit was not plagued with lies, misconceptions, or omissions. The Court returns to Villalobos's three primary arguments to explain its holding.

## A. Threats Directed at "Authority Figures" and Gun Placement

Villalobos begins by arguing that Agent Hare's statement that he "has made threats to shoot authority figures coming on his property" and has placed items in certain locations with the "intent of shooting authority figures" is demonstrably false. He claims Agent Hare's belief that he is anti-law enforcement stems from his Facebook post regarding Bobbi Ann (*see* Dkt. 92-11, at 4), but that this post cannot be interpreted to show he was hostile towards *law enforcement* or *authority figures*. The Court tends to agree with Villalobos that *that* specific post does not directly constitute threats to shoot law enforcement. However, the lines Villalobos contends are misleading or false should be read in context. Agent Hare stated: "The evidence I have reviewed indicates Villalobos commonly carries an assault rifle with him, has threatened to kill acquaintances with said firearm, and has made threats to shoot authority figures coming on his property." Dkt. 92-2, at 10. He goes on to say that "Villalobos claims to have measured shooting distances and placed windage flags on his property, and to have placed guns in vantage points with the intent of shooting

---

[10] Again, there is testimony and evidence in the record tending to show that law enforcement agents audibly announced their presence.

authority figures." *Id*.

Within that framework, it is important to note that Villalobos does not dispute the bulk of what Agent Hare stated. He does not dispute he often carried an assault rifle, threatened to kill acquaintances with said rifle, measured shooting distances, and placed windage flags and guns in strategic positions. Thus, the best way to read Villalobos's objection is simply that he objects to the phrases "has made threats to shoot authority figures" and "with the intent of shooting authority figures."

Villalobos reiterates that none of the Facebook messages are directed squarely at law enforcement. And he consistently notes that the primary message Agent Hare apparently used in support of his contention that Villalobos had an "anti-law enforcement" mentality was clearly directed at Bobbi Ann and the contested estate of his father, not law enforcement or authority figures. This may be true. But the same thing cannot be said of some of the other Facebook messages. Or at least there is no clear way to tell. Many of the messages are not obviously directed at anyone. In other words, it could as easily be said they were meant for law enforcement as not. Villalobos says he is "waiting for *them*," that "*they'll* wait till the darkest part of night I expect," that "*they* just been clocking me," and that he'd "love to crush *their* skulls" and "cut out *their* still beating hearts." *See generally* Dkt. 92-10. Even when read it the broader context of all the messages that evening, it is hard to distinguish who Villalobos is taking about. "They" could be family, authority figures, or strangers.

Even accepting the idea that Villalobos did not explicitly call out any law enforcement officers or other "authority figures" for harm, that does not negate the security

risk he actually posed to law enforcement or authority figures. It is no stretch to look at Villalobos's prior threats to harm (and even kill) family members—on social media and as reported to tribal police—combined with his commentary about tactical and strategic plans for conflict, and conclude he may pose a risk to "authority figures."[11] Additionally, Villalobos often carried his AK-47 *even when interacting with law enforcement*.[12] These combined factors lead Agent Hare to possess a "reasonable suspicion that knocking and announcing their presence . . . would be dangerous or futile . . . ." *Richards,* 520 U.S. at 394.

One of Villalobos's primary concerns with Agent Hare's representations is that the Facebook information is "stale." Agent Hare applied for the no-knock warrant in February of 2019, but the Facebook posts he referenced in support were from the prior March. That timeline is accurate. But again, it does not negate the security risk Villalobos posed to officers. Furthermore, Agent Hare included in his affidavit Villalobos's September 2018 interactions with law enforcement; his own October 2018 interviews with officers from that incident; a report in November 2018 indicating Villalobos had "numerous firearms" at his residence and individuals stayed away due to his "erratic activity"; another November 2018 report indicating Villalobos's nephew and his girlfriend moved out because

---

[11] Villalobos also spray-painted warnings and obscenities directed towards Governmental entities (which could be considered authority figures).

[12] The fact that Villalobos owned a gun, in itself, would typically *not* be sufficient to justify a no-knock warrant. *See United States v. Bynum*, 362 F.3d 574, 581 (9th Cir. 2004) (". . .the presence of a gun, standing alone, is insufficient to justify noncompliance with the knock and announce rule.") That said, "the presence of a firearm coupled with evidence that a suspect is willing and able to use the weapon will often justify noncompliance with the knock and announce requirement." *Id*. In this case, it is clear from Villalobos's behavior that he was willing to use his firearm. Twice in one day Villalobos posted he would "shoot" people and likely go to prison. Dkt. 92-10. The evidence suggests he was not afraid to use the firearm he carried.

Villalobos had threatened to kill them; and Villalobos's interactions with Fisheries employees in January of 2019. In sum, though the Facebook posts themselves might have been somewhat "dated,"[13] numerous intervening events validated the sentiment Villalobos expressed in those messages.

Relatedly, Villalobos takes issue with the above-mentioned events that Agent Hare rehearsed for Judge Bush arguing that, though there is "nothing wrong with starting from referred information," the FBI made "no effort" to independently confirm everything it had heard about him. Dkt. 92, at 19. Villalobos suggests the FBI could have "sent him a letter, stopped him in public, or taken similar controlled investigative measures" as opposed to serving a warrant on his residence. *Id*. at 19–20. Could law enforcement have approached the situation differently? Yes. But was the method they chose here wrong? No. Frankly, approaching Villalobos beforehand (particularly "in public") could have turned out *worse* than "surprising" him at home with the no-knock warrant. Nobody will ever know if another alternative might have worked "better." But based on what law enforcement knew at the time—that Villalobos had threatened others; that he frequently carried a weapon (modified for quick reloading); and that he exhibited erratic, hostile, or delusional behavior—the approach they decided on was reasonable.

In conclusion, to say Agent Hare's reference to "authority figures" was false or reckless is unsupported by the evidence. Critically, while Villalobos disagrees with the language, he has not put forth anything illustrating that Agent Hare's use of the language

---

[13] Even then, this was obviously an ongoing investigation. The fact that it took some time to apply for the warrant does not particularly concern the Court.

was intentionally misleading. *See, e.g., United States v. Dozier,* 844 F.2d 701, 705–06 (9th Cir.1988) (denying a *Franks* hearing when defendant failed to prove that omissions and false statements were intentional). At best, these references were mistaken, sloppy, or imprecise. But that is not enough to clear the bar necessary for a *Franks* hearing. And even assuming arguendo that the Court concluded the language was unequivocally false, that finding would still not negate the no-knock provision in the warrant. As the Supreme Court held in *Franks*: "[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." 438 U.S. at 171–72. Thus, even if the Court removed the language about shooting "authority figures" from both lines in Agent Hare's affidavit, there would still be ample evidence supporting the no-knock provision.[14] Agent Hare was looking at the totality of the circumstances and all the evidence he had accumulated over his roughly one-year investigation. He accurately represented that evidence in his affidavit.

## B. Interactions with Fisheries Employees and Police

Villalobos next contends that "other material omissions and misrepresentations [] improperly skewed the no-knock application." Dkt. 92, at 20. He specifically references his interactions with fisheries employees in January of 2019 and the September 18, 2018 incident with police at his residence, arguing that both events show he was amicable and

---

[14] The Court will not repeat all that evidence here. Suffice it to say, everything the Court has outlined above would cause concern and justify a no-knock provision. Whether Villalobos was directing his threats at family, friends, the general public, law enforcement, or "authority figures" is beside the point. On more than one occasion he had threatened to shoot or kill others; he was known to carry an AK-47, and he had a history of erratic behavior. Those factors all justified a no-knock warrant.

non-threatening. He then argues that leaving out critical details—such as a fisheries employee greeting him and the fact that *he* called the police to his property on September 18—did not provide Judge Bush with the full picture of who he was. Instead, Agent Hare only included the "most adverse details" to get what he wanted. *Id*.

The Court does not want to wander into the weeds too far, but again, it is important to put these statements in context. Villalobos is correct: Agent Hare never said that it was he, Villalobos, who called law enforcement for help on September 18, 2018. He does say, however, that Villalobos told officers that people were "trying to detonate or burn his house to the ground" and had "placed red phosphorous in his yard," which seems to indicate Villalobos called law enforcement to him to address these concerns. Furthermore, Agent Hare is upfront about Villalobos's compliance with officers asking him to put his rifle down during the interactions that night. That fact is not "adverse," but favorable to Villalobos.

Similarly, while Agent Hare did not specifically mention that one of the fisheries employees knew Villalobos and that none of them indicated he had actually threatened them, he did indicate that "Villalobos never pointed the AK-47 at the fisheries personnel." Dkt. 92-2, at 9. Again, that fact is not "adverse" to Villalobos, but shows he was arguably non-threatening, as he suggests.

To a certain degree then, this is a disagreement about semantics and style. Could more information have been provided? Of course. But was the information included here insufficient, misleading, or false? No. Again, even had Agent Hare specifically stated that

MEMORANDUM DECISION AND ORDER – 24

Villalobos called law enforcement to his property,[15] that a fisheries employee knew Villalobos, and that none of them were affirmatively threatened, it would not undermine the request for a no-knock warrant. "The pivotal question is whether an affidavit containing the omitted material would have provided a basis for a finding of probable cause." *United States v. Garcia-Cruz*, 978 F.2d 537, 541 (9th Cir. 1992). Here, even if the above "favorable" details had been included, it would not have changed the outcome. The other instances of threatening behavior, coupled with the fact that Villalobos frequently carried an AK-47, supported Agent Hare's request.

To borrow a phrase regarding the need for a search, "the omission rule does not require an affiant to provide general information about every possible theory, no matter how unlikely, that would controvert the affiant's good-faith belief that probable cause existed for the [no-knock warrant]." *United States v. Craighead*, 539 F.3d 1073, 1081 (9th Cir. 2008). Agent Hare did not need to try to explain every situation, put forth alternative explanations, or challenge his own conclusions regarding Villalobos's dangerousness with examples of his humanity. His mandate was simply to provide "all relevant information" to Judge Bush. Unfortunately, this is a subjective standard. What one person thinks is relevant may differ from another. But as noted above, "there is[] a presumption of validity with respect to the affidavit supporting the search warrant." *Franks* 438 U.S. at 171. "The task of the issuing magistrate is simply to make a practical, common-sense decision

---

[15] As an aside, the substance of the September 28, 2018, interaction was concerning it and of itself. Villalobos may have called officers there, but he proceeded to exhibit paranoid and delusional behavior, suggesting that unknown persons were trying to kill him or burn down his house with various household objects scattered around his property.

whether, given all the circumstances set forth in the affidavit before him" he should grant the request. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The omissions here regarding whether Villalobos was amicable to fisheries employees and law enforcement on prior occasions are minor and do not alter the overall tenor of the threat Villalobos posed to law enforcement. Again, even if the Court were to omit the September 2018 law enforcement visit and Villalobos's interactions with fishery employees entirely, there would still be ample evidence to persuade a judge that a no-knock warrant was appropriate.

**D. Conclusion**

Setting aside whether this was even a "no-knock" situation to begin with and whether a *Franks* hearing and/or suppression motion is the correct way to challenge the "no-knock" provision under § 3109, the Court finds Villalobos has not met his burden.

After thoroughly reviewing the affidavit and Villalobos's allegations, the Court concludes Agent Hare's statements were not false or misleading. Nor did he omit anything material. Even if these allegations were true and the Court struck those portions of the affidavit—and included the "omitted" positive references—the remaining information contained therein concerning threats and proximity to weapons (and a willingness to use them) still created a fair probability that Villalobos posed a threat to law enforcement and supported the request for a no-knock warrant. The Court finds the affidavit was accurate and provided reliable support for Judge Bush's inclusion of the no-knock provision.

Accordingly, even if Villalobos had substantially shown that the affidavit included false statements intentionally or recklessly—which he has not—he would still not be entitled to a *Franks* hearing.

# V. ORDER

THE COURT HEREBY ORDERS:

1. Villalobos's Motion for Discovery (Dkt. 89) IS GRANTED. The Government has provided a sufficient answer.

2. Villalobos's Motion for an Evidentiary Hearing and to Suppress (Dkt. 92) is DENIED IN PART as it relates to the request for a *Franks* hearing. The remainder of the Motion remains under consideration. Villalobos may challenge the search if he so desires at the upcoming hearing,[16] but the testimony and evidence may not include challenges to the veracity of the affidavit in support of the warrant.

3. The Court will coordinate with Counsel in the near future regarding certain organizational aspects of the April 11, 2023 hearing.

DATED: March 31, 2023

David C. Nye
Chief U.S. District Court Judge

---

[16] The Court fully understands that this may not be possible. Villalobos's primary argument supporting suppression was that the affidavit contained false and misleading statements. Today, the Court finds Villalobos has not met his threshold burden and will not allow a *Franks* hearing (i.e., it will not allow any challenges to the affidavit). This finding effectively guts Villalobos's argument for suppression. That said, the Court is not foreclosing any other valid arguments in favor of suppression; its holding today is simply that the affidavit was reliable and the warrant valid.