UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>MANUEL PHILLIP VILLALOBOS,<br><br>    Defendant. | Case No. 3:19-cr-00040-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court is Defendant Manuel Villalobos's Motion to Dismiss Count One of the Indictment (Dkt. 90) and his Motion to Dismiss Count Ten of the Indictment (Dkt. 91). The Court held oral argument on April 11, 2023, and took both motions under advisement. Upon review, and for the reasons below, the Court DENIES both motions.

## II. BACKGROUND

The Court detailed the factual and procedural history of this case in a prior order and incorporates that summary here by reference. *See* Dkt. 103, at 2–13.

As noted in the Court's prior decision, Villalobos filed the instant motions, along with others, on January 20, 2023. Dkts. 90–92. The Court ruled on Villalobos's Motion to

Suppress for *Franks* Violations in its prior decision. Dkt. 103. Today it addresses the remaining Motions to Dismiss.

Each pending motion addresses a different Count in the Indictment—Count One and Count Ten. Dkts. 90, 91. Count One charges Villalobos with Unlawful Possession of a Firearm under 18 U.S.C. § 922(g)(1) and Count Ten charges him with Possession of an Unregistered Firearm under 26 U.S.C. § 5861(d). Dkt. 28, at 1, 5. Villalobos asks that both Counts be dismissed. The Government filed a combined opposition to Villalobos's motions. Dkt. 99. Villalobos replied solely regarding his Motion to Dismiss Count One. Dkt. 101. He rested on his prior brief as it relates to Count Ten. *Id.* at 4 n.7.

### III. LEGAL STANDARD

Under Federal Rule of Criminal Procedure 12(b)(3)(B), a defendant may challenge the sufficiency of an indictment. Indictments "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient if it: (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend"; and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). The failure of an indictment to recite an essential element of a charged offense is a "fatal flaw requiring dismissal of the indictment." *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999).

"[A]n indictment 'should be read in its entirety, construed according to common sense, and interpreted to include facts which are necessarily implied.'" *United States v. Berger*, 473 F.3d 1080, 1103 (9th Cir. 2007) (quoting *United States v. King*, 200 F.3d 1207,

1217 (9th Cir. 1999)). In cases when an indictment "'tracks the words of the statute charging the offense,' the indictment will be held sufficient 'so long as the words unambiguously set forth all elements necessary to constitute the offense.'" *United States v. Davis*, 336 F.3d 920, 922 (9th Cir. 2003) (quoting *United States v. Fitzgerald*, 882 F.2d 397, 399 (9th Cir. 1989)). In reviewing a motion to dismiss an indictment under Rule 12(b)(3)(B), a court must accept the facts alleged in the indictment as true. *Winslow v. United States*, 216 F.2d 912, 913 (9th Cir. 1954).

## IV. ANALYSIS

### A.  Motion to Dismiss Count One (Dkt. 90)

18 U.S.C. § 922(g)(1), provides that it "shall be unlawful for any person [] who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" to possess a firearm.

In 1994, Villalobos was convicted of Burglary in the Latah County District Court of the Second Judicial District of the State of Idaho. Idaho State Case Number CR-1994-01780. By statute, burglary is a crime punishable by a term of imprisonment exceeding one year. Idaho Code § 18-403 ("Burglary is punishable by imprisonment . . . for not less than one (1) nor more than ten (10) years").

After the FBI served a warrant on Villalobos's residence (and arrested him), agents found many firearms in his possession. Based on this information and evidence, a grand jury indicted Villalobos for, among other things, Unlawful Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1). Dkt. 28, at 1. Villalobos now moves to dismiss that charge.

Villalobos's argument here is hyper-legal. He does not dispute that he has a prior conviction. He does not dispute that the prior conviction was punishable by more than one year in prison. He does not dispute he had firearms when arrested. He argues instead that § 922(g)(1) is unconstitutional and infringes on his Second Amendment rights because of a recent Supreme Court opinion. In short, he brings a facial challenge to the statute itself.

A brief review[1] of the relevant cases and how they intertwine will put Villalobos's argument in context.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, two law-abiding citizens filed suit against the State of New York, arguing its licensing regime for obtaining a permit to carry handguns in public was unconstitutional. 142 S. Ct. 2111 (2022). The Supreme Court had previously held, in *District of Columbia v. Heller*, that law-abiding citizens had a constitutional right to carry handguns for self-defense purposes, but that case focused on possession in the home, not possession in public. 554 U.S. 570 (2008).

In the intervening years, the circuit courts—including the Ninth Circuit—created a two-step framework for analyzing Second Amendment challenges based on the precedents in *Heller* and another Supreme Court case, *McDonald v. City of Chicago, Ill.,* 561 U.S. 742 (2010). That framework required courts to determine: (1) "whether the challenged law burdens conduct protected by the Second Amendment," and if so, (2) whether the

---

[1] The two main cases at issue today are long and complex. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) is 74 pages in the Supreme Court reporter. *District of Columbia v. Heller*, 554 U.S. 570 (2008) is 85 pages. Others relevant cases are even longer. *See, e.g., McDonald v. City of Chicago, Ill.,* 561 U.S. 742 (2010) (120 pages in total). Entire courses, articles, and symposiums are dedicated to these cases. The Court strives today to be clear and concise in its review, recognizing there are many nuances and arguments that cannot, and need not, be fleshed out at this time.

government could justify, under some type of heightened scrutiny, the burden imposed on the challenger's rights. *See, e.g., U.S. v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). As the *Bruen* Court noted, this framework was a combination of "history with means-end scrutiny." 142 S. Ct. at 2126. In practice, Courts tended to first look at whether the government could show it was regulating conduct that fell outside the scope of the right to bear arms as originally understood. As part of the second step, Courts then analyzed how close the challenged law came to the core of the Second Amendment right and then applied a level of scrutiny (intermediate or strict) to that law to determine whether it was constitutional.

In *Bruen*, the Supreme Court rejected this two-step approach as "one step too many," explaining that "the Courts of Appeals' second step is inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Id*. at 2127, 2129. The Court went on to explain that:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

*Id*. at 2129-30 (cleaned up). Thus, while the Supreme Court "rejected" the two-part test that circuit (and district) courts had been using, it imposed a two-part test of its own.

Here, the Court must first determine whether the plain text of the Second Amendment cover's Villalobos's conduct. If it does, the Court must next determine whether the government has justified its regulation by establishing that § 922(g)(1) is

"consistent with the Nation's historical tradition of firearm regulation." *Id*. at 2125.

The Court will address each issue in turn.

*1. Plain text*

Villalobos argues the plain text of the Second Amendment protects his right to bear arms because: (1) felons are not *excluded* from the second amendment's text; (2) he is part of "The People" as used in the Bill of Rights; and (3) felons retain similar rights under nearby amendments (such as the right to petition the government for redress). The Government did not address these arguments in its briefing. At oral argument, it summarily argued Villalobos *is not* part of the people and is *excluded* from the Second Amendment's reach, benefits, and protection.

These arguments engage a notoriously thorny question: what are the outer boundaries of "The People" as that phrase is used in the Bill of Rights? There is some evidence that, at the time of ratification, "The People" had no discrete meaning at all but was instead a pocket of intentional ambiguity where the framers could vest sovereignty without affecting the balance of power between the states and the federal government. *See* Akhil Reed Amar, *Of Sovereignty and Federalism*, 96 Yale L.J. 1425, 1439 (1987); Joseph Ellis, *Founding Brothers: The Revolutionary Generation*, 9–10 (2000). The meaning is especially elusive because there was no "American People" at the time of ratification— ironically, a major purpose of the Constitution was to "gather together the scattered strands of the population into a more coherent collective worthy of that designation." Ellis, *supra* at 9–10. In a sense, the framers were bootstrapping: vesting sovereignty and rights in a polity that was itself a product of the investiture. No wonder, then, that courts have

MEMORANDUM DECISION AND PROTECTIVE ORDER - 6

struggled to pin down the term's original meaning.

In *Heller*, Justice Scalia, writing for the majority, defined the term both broadly and narrowly. The Court held "the term unambiguously refers to all members of the political community, not an unspecified subset," 554 U.S. at 580, but also that the Second Amendment was only intended to protect "law-abiding, responsible citizens," *id*. at 635. Justice Stevens highlighted this concern in his dissent. *Id.* at 644. Those on both sides of this debate have interpreted the language to their benefit.

In May 2022 (prior to *Bruen*) the Eleventh Circuit was asked to define "The People" as applied to a defendant charged with possession of a firearm by an illegal alien in violation of 18 U.S.C. § 922(g)(5)(A). *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1043 (11th Cir. 2022). Relying on *Heller* and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), it determined that "The People" refers to a class of persons who "are part of the national community." *Id*. at 1044.

That court explained that the framers appeared conscientious about the use of the word because, when they wanted to be more restrictive, they used the word "citizen/s" and when they wanted to be more expansive, they used the word "person/s." Thus, in its estimation, "the phrase 'the people' sits somewhere in between—it has broader content than 'citizens,' and narrower content than 'persons.'" *Id*. at 1045 (cleaned up). The circuit then "assume[d] for the sake of [the] decision that he is [part of the national community] and resolve[d] the case more narrowly." *Id*. Ultimately, the *Jimenez-Shilon* Court upheld the Defendant's conviction (and the constitutionality of 18 U.S.C. § 922(g)(5)(A)) because, as an illegal alien, he did not "enjoy the right to keep and bear arms" even though he could

be considered part of "The People." *Id*. at 1050.

Villalobos cites this case for the proposition that "felons are part of 'the people' protected by the Second Amendment." Dkt. 90-1, at 4. But that holding is not as clear as Villalobos asserts it to be. As part of its discussion, the Eleventh Circuit noted in passing[2] that "as both the Supreme Court and this Court have observed, even individuals who are indisputably part of 'the people,' *such as dangerous felons* and those suffering from mental illness, might not partake of that pre-existing right and, therefore, *may be prohibited from possessing firearms without offending the Second Amendment*." *Id*. at 1046 (emphasis added). Villalobos points to the beginning of the sentence and concludes that he, as a felon, is part of "The People."

The conclusion of that sentence, however, is more probative. Even assuming that felons are part of the people, the Eleventh Circuit emphasized that, consistent with *Heller* and its own progeny of cases, felons could be prohibited from possessing firearms. Though this conclusion deals more with the second part of the Court's analysis below, it is worth mentioning here for context. Villalobos relied in briefing and at oral argument on this passing line, but when quoted in its totality, it contradicts his argument. It is also distinguishable: though the circuit endorsed the idea that "The People" included almost the whole citizenry, including felons, it was addressing whether illegal aliens were part of that group, not felons.

Villalobos also cites the Seventh Circuit, which has held that "the term 'the people'

---

[2] As will be explained below, Villalobos takes issue with certain phrases the Government relies on, arguing they are "dicta." Ironically, the phrase he relies on here would likely fit his definition of dicta as well.

in the Second Amendment has the same meaning as it carries in other parts of the Bill of Rights." *United States v. Meza-Rodriguez*, 798 F.3d 664, 670 (7th Cir. 2015). Therefore—because other parts of the Bill of Rights apply to felons—Villalobos contends that the Second Amendment must facially apply to him. Again, that case related to 18 U.S.C. § 922(g)(5), not the felon in possession statute at issue here. And though the court held that the defendant had sufficient connections with the United States—even as a non-citizen—to fall under "The People," it concluded that the Second Amendment is not unlimited, and the applicable statute did not infringe on his rights. The court also emphasized the government's "strong interest in preventing people who already have disrespected the law (including, in addition to aliens unlawfully in the country, *felons, § 922(g)(1),* fugitives, § 922(g)(2), and those convicted of misdemeanor crimes of domestic violence, § 922(g)(9)) from possessing guns." *Id*. at 673 (emphasis added).

In sum, at least two circuits agree that felons are part of "The People." They also agree, however, that statutes restricting the right of felons to bear arms are valid.[3] Again, more on that to come.[4]

---

[3] Many proponents of the position that felons are including in "the people" have cited a dissent from Justice Barrett (then Judge Barrett): "History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons. But it does support the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous." *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019), *abrogated by New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) (Barrett, J. dissenting).

[4] There truly are too many cases to recount. Recently, the Fifth Circuit invalidated § 922(g)(8) as unconstitutional. *United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023). That case includes a fascinating discussion about the *Heller* Court's use of the term "law-abiding, responsible citizen" and whether that is the new definition for "the people" as contemplated for in the Second Amendment. For its part, the *Rahimi* Court found the term was simply a "shorthand" the *Heller* Court used to explain its holding that laws prohibiting the possession of firearms by felons or the mentally ill were not in jeopardy. *Id*. at 452.

Other lower courts have held similarly. *See, e.g., United States v. Coombes*, 2022 WL 4367056, at *4 (N.D. Okla. Sept. 21, 2022) ("Based on existing precedent and well-established canons of construction, the court declines to carve out felons from the scope of the Second Amendment's protection of 'the people.'")[5]

These cases only represent one side of the equation. In November 2022 (after *Bruen*), the Third Circuit held that felons "fall outside 'the people' entitled to keep and bear arms." *Range v. Att'y Gen. U.S.*, 53 F.4th 262, 284 (3d Cir. 2022). That court so held after a careful analysis of English and early American rules, laws, and customs regarding disarmament of persons convicted of crimes and the concept of a "virtuous citizenry." *See id*. at 274-82. The Court will not, however, delve into this case further because the decision has been vacated pending an upcoming rehearing en banc. *Range v. Att'y Gen. U.S. of Am.,* 56 F.4th 992 (3d Cir. 2023). The Court is nevertheless persuaded by *the historical analysis outlined in the decision* and the conclusion that felons are not part of "The People" when viewed in the context of the Second Amendment.

Finally, the Ninth Circuit—the only court whose opinions bind the Court—has affirmed (albeit in an unpublished opinion without any explanation)[6] that unless a person is a "law-abiding or responsible citizen" he or she is "outside the plain text of the Second Amendment." *United States v. Perez-Garcia*, 2022 WL 4351967, at *6 (S.D. Cal. Sept. 18, 2022), *review denied*, 2022 WL 17477918 (S.D. Cal. Dec. 6, 2022), and *aff'd sub nom.*

---

[5] The Court points out, again, that while other Courts found felons were part of "the people" it cannot locate any that found 922(g)(1) unconstitutional.

[6] The Circuit noted "an opinion explaining this disposition will follow," however, to date, no decision has been issued. Garcia, 2023 WL 2596689 at *1.

*United States v. Garcia*, 2023 WL 2596689 (9th Cir. Jan. 26, 2023). Many district courts across the country have lined up behind the same position.[7]

There are good arguments on both sides. For its part, the Court is more persuaded by those Courts who have reviewed the historical analogs and found that felons are excluded from "The People."[8] Among the other qualifications[9] that may be inferred from the Constitution's allocation of rights, history shows that there was some basic expectation of adherence to critical laws. *See, e.g.*, *Range*, 53 F.4th at 274–82 (discussing the expectation of a "virtuous citizenry"); *United States v. Riley*, 2022 WL 7610264, at *11 (E.D. Va. Oct. 13, 2022) (establishing that the commission of a felony traditionally

---

[7] Once again, there are too many cases to cite. Though there are consistent arguments and analysis on both sides, nuances arise that are interesting. The Court is particularly intrigued by one court's analysis of the argument that "The People" is consistent between multiple amendments and, therefore, dictates the outcome here. Consistent reference there may be. But there are also consistencies in restricting the rights of felons as applied to other rights.

> Consider the following syllogism. *Heller* confirmed that "the people" referred to in the Second Amendment are the same people referred to elsewhere in the Constitution—*i.e.* those considered part of the political community—including those with the power to vote under Article I, Section 2. But our nation's history affirms a longstanding historical tradition from the time Congress ratified the Second Amendment to exclude those convicted of a crime from the right to vote (*i.e.*, participation in a political community). Moreover, at the time of the Second Amendment's ratification, the right to vote, hold public office, or serve on a jury were thought of as equal to keeping and bearing arms because all were so-called political rights. Therefore, it would seem strange that the Founders considered the right to bear and keep arms somehow less prone to restriction than the right to cast a ballot. The right to vote and the right to bear and keep arms are historically closely knit.

*United States v. Riley*, 2022 WL 7610264, at *11 (E.D. Va. Oct. 13, 2022) (internal citations, quotations, explanatory parentheticals, and references omitted for readability).

[8] And, to the degree it can be, the Court is bound by the Ninth Circuit's affirmance in *Garcia* and the underlying court's holding on the same wise.

[9] Whoever else may have fallen under the framers' concept of "The People," Black People, Native Americans, and—to a large degree, women—did not.

removed a person from the political community); *United States v. Collette*, 2022 WL 4476790, at *8 (W.D. Tex. Sept. 25, 2022) (examining American tradition and finding that one could waive his rights—and so his place within "The People" – by committing violent crimes).

Villalobos essentially argues that, by being part of "The People," one is entitled to all the attendant rights. Though this is true, it tends to put the cart before the horse. The Court is persuaded that, definitionally, "The People" are those who enjoy constitutional rights. The bounds of that polity are set, not by geography or demography, but by law— and felons fall outside them.

The Court agrees with the thorough historical analysis outlined in *Riley* and its holding that "A plain reading of the text demonstrates that 'the people' remains limited to those within the political community and not those classified as felons" 2022 WL 7610264, at *10, and the equally in-depth review performed by the Court in *Collette* and its finding that "this Nation has a historical tradition of excluding felons and those who abuse their rights to commit violence from the rights and powers of 'the people.'" 2022 WL 4476790, at *7 (W.D. Tex. Sept. 25, 2022) (also finding that "Consistent with *Heller*'s definition, if groups have been categorically excluded under other constitutional provisions bestowing rights to 'the people,' logic demands that society could also exclude those groups from under the Second Amendment").[10]

---

[10] And the Court is not ignorant that this approach holds potential pitfalls of its own. The Court in *United States v. Goins* addresses one of these concerns, namely that if certain individuals fall entirely outside the Second Amendment, no state statute or action is necessary to disarm them. 2022 WL 17836677, at *6–7 (E.D. Ky. Dec. 21, 2022).

In sum, the Court finds that history and tradition favors limitations on the definition of "The People"—at least as it concerns individuals who have stepped outside the bounds of society by committing a felony. The Bill of Rights outlines how the government and the citizenry interact. There is nothing to suggest, however, that individuals who willingly step outside the political community, for whatever reason, should never face any consequences or diminution of any right. True, some rights should never be taken away, even if one of "The People" is seen as unworthy to be in society and is incarcerated. These rights, which apply specifically to those facing prosecution, are immediately obvious by context. Other rights, however, may be curtailed based on a person's choices and are applicable only to "The People" who choose to remain within the bounds of the political community. The Second Amendment represents such a situation.

Still, for the sake of thoroughness—and because whether Villalobos, as a felon, is part of "The People" is so unsettled and divisive—the Court will nevertheless perform the second prong of the *Bruen* analysis.

As will be explained, unlike the split among courts regarding whether felons are part of "The People," there is absolute consistency when it comes to the question of whether congress can limit the Second Amendment rights of felons. The resounding and unanimous answer is yes.

### 2.  *§ 922(g)(1) Justification*

Next, the Court must consider whether prohibiting felons from possessing firearms is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. To do this, the Court examines precedent from before, during, and after the

founding to see whether it "evinces a comparable tradition of regulation" as the regulation being challenged. *Id*. at 2132. The process usually involves "reasoning by analogy." *Id*.

Villalobos is not the first criminal defendant to argue that § 922(g)(1) is unconstitutional after *Bruen*. Dozens of such challenges have been raised post-*Bruen*. Each court presented with the issue has found there is historical context for treating felons differently when it comes to firearm ownership.[11] In fact, the Court cannot locate *a single* decision where a court found this Nation's history and traditions would *allow* felons to possess firearms.

The highest court to so rule is the Third Circuit. *See Range,* 53 F.4th at 285 ("our Nation's tradition of firearm regulation permits the disarmament of those who committed felony or felony-equivalent offenses."). That said, as mentioned, the full Third Circuit recently voted to rehear the matter en banc. *Range v. Att'y Gen. U.S. of Am.*, 56 F.4th 992 (3d Cir. 2023). District Courts as recently as last week have ruled the same. *See, e.g., United State of America v. Aaron Scott Gonzales*, 2023 WL 2955922, at *2 (S.D. Tex. Apr. 14, 2023) (". . . restrictions prohibiting convicted felons from possessing firearms do not violate the Second Amendment."); *United States v. Tamonte Finney*, 2023 WL 2696203, at *3 (E.D. Va. Mar. 29, 2023) (holding *Bruen* did not change the long history of cases upholding § 922(g)(1)'s constitutionality and finding it "unnecessary to engage in the historical analysis test articulated in *Bruen*" because it was already "settled that felon in

---

[11] The Court's research shows there are well over 100 such cases. It will not cite to them all here. Other Courts have gathered many of these cases. The interested reader is referred to those collections. *See, e.g., United States v. Carrero*, 2022 WL 9348792, at *3 (D. Utah Oct. 14, 2022) (collecting cases); *United States v. Jackson,* 2022 WL 18956628, at *4 (D. Ariz. Dec. 9, 2022), report and recommendation adopted, 2023 WL 1965424 (D. Ariz. Feb. 13, 2023) (collecting cases).

possession prohibition laws are consistent with the Founders' understanding of the Second Amendment at ratification"); *United States v. Dixon,* 2023 WL 2664076, at *5 (N.D. Ill. Mar. 28, 2023) (holding § 922(g)(1) constitutional because "regulations that prevent dangerous individuals from acquiring or owning firearms [] align with how the founders thought the legislature should decide which groups pose a threat to the social order or the community") (cleaned up).

The Court turns closer to home. Very recently, the District Court of Alaska found that "the Supreme Court's previous emphasis on the validity of prohibitions on the possession of firearms by felons continues after *Bruen*." *United States v. Cleveland-McMichael*, 2023 WL 2613548, at *4 (D. Alaska Mar. 23, 2023). Citing Ninth Circuit cases that previously upheld § 922(g)(1) as constitutional—which will be discussed shortly—the District Court confirmed the statute is constitutional.

This case is no anomaly. To date, *all* District Courts within the Ninth Circuit, *including Idaho*, which have addressed § 922(g)(1) post-*Bruen* have found that it remains constitutional. *See Walker v. Bonta*, 2023 WL 2815356 (S.D. Cal. Apr. 6, 2023); *United States v. Guthery*, 2023 WL 2696824, at *6 (E.D. Cal. Mar. 29, 2023); *United States v. Kilgore*, 2023 WL 2505012 (E.D. Cal. Mar. 14, 2023); *United States v. Davis*, 2023 WL 2505039, at *4 (E.D. Cal. Mar. 14, 2023); *United States v. Barber*, 2023 WL 2140526 (D. Alaska Feb. 21, 2023); *United States v. Jackson*, 2023 WL 1965424 (D. Ariz. Feb. 13, 2023); *United States v. Moore*, 2023 WL 154588, at *2 (D. Or. Jan. 11, 2023); *United States v. Wondra*, 2022 WL 17975985 (D. Idaho Dec. 27, 2022); *United States v. Serrano*, 2023 WL 2297447 (S.D. Cal. Jan. 17, 2023); *United States v. Jackson,* 2022 WL 18956628

(D. Ariz. Dec. 9, 2022), *report and recommendation adopted*, 2023 WL 1965424 (D. Ariz. Feb. 13, 2023); *United States v. Carleson*, 2022 WL 17490753 (D. Alaska Oct. 28, 2022); *Walker v. United States*, 2022 WL 16541183 (S.D. Cal. Oct. 28, 2022); *United States v. Ridgeway*, 2022 WL 10198823 (S.D. Cal. Oct. 17, 2022); *United States v. Delpriore*, 2022 WL 17490771 (D. Alaska Oct. 4, 2022);  *United States v. Siddoway*, 2022 WL 4482739, at *1 (D. Idaho Sept. 27, 2022); *United States v. Perez*, 2022 WL 17484969 (S.D. Cal. Sept. 26, 2022); *United States v. Hill*, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States. v. Nevens*, 2022 WL 17492196 (C.D. Cal. Aug. 15, 2022); *United States v. Ramos*, 2022 WL 17491967 (C.D. Cal. Aug. 5, 2022).

The District of Idaho was actually one of the first District Courts in the Ninth Circuit to rule on this issue post-*Bruen*. In September 2022, Senior District Judge B. Lynn Winmill was presented with the same arguments Villalobos brings here. Judge Winmill looked back to prior Ninth Circuit cases and held that nothing in *Bruen* changed those holdings. He upheld § 922(g)(1) as constitutional. *Siddoway*, 2022 WL 4482739, at *1. And, as noted above, Judge Winmill repeated that same finding a few months later in *Wondra*.

 The Court has alluded to certain Ninth Circuit cases the districts above relied on in making their decision and briefly reviews them now.

Relying on *Heller* and *McDonald*, the Ninth Circuit has repeatedly held that the felon-in-possession statute does not violate the Second Amendment. Though the opinions preceded *Bruen*, they still analyzed "historical analogs." Thus, consistent with its sister-districts, the Court's holding today is that the analysis from these prior cases is still good law: it has not changed since the issuance of *Bruen*, and it is dispositive of Villalobos's

arguments.

In *United States v. Phillips*, the Ninth Circuit held that "under Supreme Court precedent and our own," the court "must" "assum[e] the propriety of felon firearm bans." 827 F.3d 1171, 1175 (9th Cir. 2016). And in *Van Der Hule v. Holder*, the Circuit said that "§ 922(g)(1) continues to pass constitutional muster." 759 F.3d 1043, 1051 (9th Cir. 2014). Both these cases referenced a prior case from 2010, *United States v. Vongxay,* 594 F.3d 1111, 1118 (9th Cir. 2010). *Vongxay* is the primary case all district courts within the Ninth Circuit have relied on to uphold § 922(g)(1), and so is also the primary case Villalobos (and others) have attacked as not meeting the requirements of *Bruen*.

In *Vongxay*, the Circuit held that "§ 922(g)(1) does not violate the Second Amendment as it applies to Vongxay, a convicted felon." 594 F.3d at 1118.[12] The Circuit recognized that "the historical question has not been definitively resolved," but held that "most scholars of the Second Amendment agree that the right to bear arms was inextricably . . . tied to the concept of a virtuous citizenry that would protect society through defensive use of arms against criminals" and that "the right to bear arms does not preclude laws

---

[12] Interestingly, *Vongxay* was based largely on a prior Ninth Circuit case, *United States v. Younger,* 398 F.3d 1179 (9th Cir.2005). In *Younger*, the Ninth Circuit held, in part, that the Second Amendment *did not* confer an individual right to bear arms. *Heller* invalidated that holding. Hence Vongxay renewed the challenge thinking the Circuit would side with him in light of *Heller*. The Circuit in *Vongxay* however, said that though *Younger* had been overruled, the *underlying reasoning* regarding felons was still valid. Again, somewhat ironically, the "underlying reasoning" in *Younger* was not overly robust but focused primarily on other cases that had undertaken a more thorough historical analysis. *Id.* at 1192. The Circuit in *Vongxay* recounted this history and then explained why its findings from *Younger* were still applicable post *Heller*. But, to alleviate the concern of citing to a case that had been overturned and was based heavily on other cases, the Circuit expounded upon its *Younger* holding with more cases and commentary regarding the constitutionality of § 922(g)(1). *Vongxay*, 594 F.3d 1116–18. Thus, *Vongxay* better explained the Ninth Circuit's position as originally outlined in *Younger*. And to be clear, that position was that § 922(g)(1) represented a limited and narrowly tailored exception to the freedom to possess firearms and was constitutional.

disarming the unvirtuous citizens (i.e. criminals)." *Id.* (cleaned up); *United States v. Chovan*, 735 F.3d 1127, 1141–42 (9th Cir. 2013) (same).[13]

This holding is not limited to the Ninth Circuit. Before *Bruen* (but after *Heller*) other circuits also recognized that federal statutes prohibiting felons from possessing firearms do not violate the Second Amendment. In fact, the circuit courts have *unanimously* upheld the constitutionality of § 922(g)(1) against facial attacks. *See, e.g., United States v. Greeno*, 679 F.3d 510, 519–20 (6th Cir. 2012) (tracing the history of laws separately penalizing or increasing the severity of punishment for crimes committed by individuals using weapons during the commission of the crime); *United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) ("[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm unvirtuous citizens." (cleaned up)); *United States v. Emerson*, 270 F.3d 203, 226 n.21 (5th Cir. 2001) (discussing historical authority as early as the 18th century excluding felons from possessing firearms).

Villalobos argues *Bruen* effectively overruled *Vongxay* (and other similar Ninth Circuit cases) because it operated under the "old" two-part framework (or no framework at all). The Court finds *Bruen* did not upend the holdings of these cases.[14]

---

[13] It is true that other researchers have put forth differing opinions. Villalobos cites some of those scholars in his motion. The Court need not weigh the competing authority as it is bound by Circuit precedent. That said, the Court is more persuaded by the abundance of cases, articles, and findings cited by courts—district, appellate, and the Supreme Court—which confirm there are historic ties to limitations on felons bearing arms.

[14] Other district courts have likewise held. *See, e.g., Gonzales*, 2023 WL 2955922, at *2 (citing Fifth Circuit cases from 2017, 2010, and 2004 that upheld the constitutionality of § 922(g)(1) and noting it "remain[ed] bound by this Circuit's precedent on Section 922(g)(1)").

As noted, the Ninth Circuit has consistently relied on *Heller* and *McDonald* to determine the constitutionality of § 922(g)(1) in numerous cases—including *Vongxay*. But contrary to Villalobos's contention, nothing in *Bruen* suggests that the Supreme Court abandoned its earlier rulings in *Heller* and *McDonald*. In fact, both the concurring and dissenting opinions in *Bruen* clarify that *Heller* remains unaffected by *Bruen*. *See id.* at 2162 (Kavanaugh, J., concurring) (Justice Kavanaugh and Chief Justice Roberts, concurring with the majority, reiterated what they perceived as the continuing validity of *Heller*'s presumptively lawful prohibitions by stating that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons"); *id.* at 2157 (Alito, J., concurring) ("[n]or have we disturbed anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns"); *id.* at 2189 (Breyer, J. dissenting) ("[l]ike Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding," i.e., that prohibitions on the possession of firearms by felons are presumptively lawful).

Villalobos, like others before him, argues the above commentary from *Heller* is simply "dicta." Be that as it may, lower courts are "bound by Supreme Court dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." *Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1243 (10th Cir. 2008). That the "dicta" at issue here was repeated in not one, but two, subsequent Supreme Court decisions—and by both the majority and the dissent—strengthens the Court's impression that it should be followed.

Continuing with the idea that nothing in *Bruen* signifies a departure from *Heller* or *McDonald*, the Court notes, as other Courts have, that *Bruen* actually reinforced the holdings in *Heller* and *McDonald* in many respects. In all three cases, the Supreme Court repeatedly distinguished law-abiding citizens from non-law-abiding citizens and held that only the conduct of the former falls within the scope of the Second Amendment. *See United States v. Snead*, 2022 WL 16534278, at *5 (W.D. Va. Oct. 28, 2022) ("This trilogy of Supreme Court cases makes clear that the Second Amendment protects the conduct of law-abiding citizens, and provides no constitutional sanctuary for those who use firearms to commit crimes."); *United States v. Young*, 2022 WL 16829260, at *9 (W.D. Pa. Nov. 7, 2022) ("*Bruen* generally left undisturbed the regulatory framework that keeps firearms out of the hands of dangerous felons.").

Wrongful convictions aside, one cannot be both a felon and a law-abiding citizen. Committing burglary, as Villalobos did, is not lawful. Nor is there any indication he was committing burglary to further his right to keep and bear arms for self-defense. Accordingly, the activity regulated by the prohibitions against felons in possession of firearms is "categorically unprotected," *Bruen*, 142 S. Ct. at 2126, and the holdings of *Vongxay* (and *Van Der Hule* and *Phillips*) remain binding on this Court.

Again, like others before him, Villalobos takes issue with the fact that the Ninth Circuit's analysis in its prior cases was under the older, and now overruled, two-part test. But again, regardless of the type, or form, of the test employed, the Ninth Circuit undertook a historical analysis—as required by *Bruen*—in *Vongxay* and found § 922(g)(1) constitutional. As noted, (*see supra* note 12), the Circuit's analysis in that case was

thorough. The historical evidence referenced in it remains unchanged even if the framework of its presentation is different. And the Court need not reiterate the analysis here to illustrate the point. *See Gonzales*, 2023 WL 2955922, at *2 (referring to the constitutionality of § 922(g)(1) and finding that it "need not address the merits of this issue at length as other courts have already done so"); *Serrano*, 2023 WL 2297447, at *10 (S.D. Cal. Jan. 17, 2023) ("because the Court is bound by Ninth Circuit precedent upholding the constitutionality of § 922(g)" it need not "address whether the regulations are consistent with this Nation's history of firearm regulation").

Even if the Court were to completely set aside *all* the above case-law, however, and engage in a brand-new historical analysis as requested by Villalobos, the motion would still be denied. The Court would refer to the same history, caselaw, and scholarly analysis that every other Court has considered before it.[15] The Court is especially persuaded by the analysis of the district court in *Ramos*, 2022 WL 17491967, at *4–5 and that of the Court of Appeals for the D.C. Circuit in *Medina v. Whitaker*, which "look[ed] to tradition and history" and concluded that "the historical evidence and the Supreme Court's discussion of felon disarmament laws leads us to reject the argument that non-dangerous felons have

---

[15] Villalobos takes issue with this approach and asserts all other Courts did not undertake a "rigorous" analysis of the issue. Setting aside the issue of whether Villalobos would accept the rigor of any analysis that did not come out his way, the Court today is not being lazy by citing other courts, nor is its analysis lacking in rigor by accepting other courts' recitation of the relevant history. The Court could fill pages with the law review articles, treatises, and dissertations outlining the historical analogs and traditions of disarming those who failed to uphold the virtuous citizenry that our founders envisioned. But to what end? It has been exhaustively outlined before. There is no need for the Court to recite the same things again here just for the sake of saying it did it in this case.

a right to bear arms." 913 F.3d 152, 158–59 (D.C. Cir. 2019).[16]

Villalobos argues this evidence can hardly be called "historic" when felon in possessing laws did not come into effect until 1923. Though these specific statutes may be relatively new, this Nation has a long history of restricting access to firearms to law-abiding citizens. The many cases above illustrate this principle.

Villalobos's arguments are unpersuasive. *Vongxay* is binding on this Court and its analysis is still good law. There is a history and tradition of restricting the Second Amendment rights of persons convicted of felonious conduct. That has not changed under *Bruen*. The Court will not dismiss Count One of the Indictment. The Motion is DENIED.

### B.  Motion to Dismiss Count Ten (Dkt. 91)

26 U.S.C. § 5861(d) provides that is "shall be unlawful for any person [] to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record. . . ."

As outlined in the Court's prior decision, the FBI found a picture of Villalobos holding a pistol with a silencer attached. Dkt. 103, at 7–8. That silencer was later found when Villalobos was arrested.

Count Ten of the Indictment charges Villalobos with possessing a Huntertown Arms, Model Guardian 22 XL firearm silencer, bearing serial number G22X338. Dkt. 28 at 5. It also alleges that this firearm is not registered to Villalobos in any way.

Like his argument about Count One, Villalobos contends that silencers qualify as

---

[16] As with *Vongxay*, *Medina* pre-dates *Bruen*. Nevertheless, like *Vongxay*, the historical review and analysis contained therein is still applicable.

"arms" and that he has a constitutional right to possess them because he is part of "The People."[17] In the alternative, Villalobos argues silencers are still implicitly protected by the Second Amendment because they render firearms useful and functional. Neither argument is persuasive.

    *1.   Silencers as "arms"*

As already explained, the Supreme Court in *Heller* held the Second Amendment protects the right of individuals to possess firearms against certain restrictions imposed by the government. 554 U.S. 570 (2008). The Supreme Court recognized, however, that "the Second Amendment is not unlimited," and does not include the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626. It recognized that the Second Amendment protects only "the sorts of weapons . . . in common use," and does not extend to "dangerous and unusual weapons." *Id.* at 627.

The Ninth Circuit has already determined that "Silencers, grenades, and directional mines are not typically possessed by law-abiding citizens for lawful purposes . . . [and] therefore are not protected by the Second Amendment." *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009). As the Tenth Circuit has also observed, "A silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence'). Accordingly, it can't be a 'bearable arm' protected by the Second Amendment." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018).

In sum, the Court agrees with the Ninth and Tenth Circuit and holds silencers are

---

[17] The Court has already addressed Villalobos's relationship to "The People" above. It will therefore proceed to the next phase of the inquiry.

not bearable arms within the meaning of the Second Amendment and are not constitutionally protected.

### 2. Implicit Protection as "Operative"

Villalobos next argues that even if silencers are not explicitly protected by the Second Amendment as "arms," they are still protected because they are necessary for the "enjoyment of rights explicitly defined" (the explicit right being the right to bear arms). *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 (1980) ("[F]undamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined.").

Villalobos contends that regulations on certain bullets, self-detaching magazines, and shooting ranges all fall under the gambit of the Second Amendment because they are necessary for the use and enjoyment of gun owners. That may be true. But none of those topics relate to the "dangerous and unusual" sub-category of arms that Courts have already decided *are not* protected by the Second Amendment.

Again, Villalobos is not the first to so argue. Just last month, a similar challenge was brought in North Carolina. There, that District Court dispensed with this same argument,[18] holding that "a firearm is effective as a weapon of self-defense without the use of a silencer, but the reverse is not true; a silencer serves no purpose without a firearm." *United States v. Saleem*, 2023 WL 2334417, at *10 (W.D.N.C. Mar. 2, 2023). This decision

---

[18] That Court was actually presented with *both* arguments Villalobos raises today and rejected the "arms" argument the Court has already addressed. *Saleem*, 2023 WL 2334417, at *9 (finding that "silencers, because they are not independently operable and do not serve any central self-defense purpose, are not firearms within the meaning of the Second Amendment but are instead firearm accessories that fall outside its protection").

post-dates *Bruen* and the Court there did, in fact, look at this regulation with an eye to *Bruen*.

Other Courts agree. *See United States v. Royce*, 2023 WL 2163677, at *4 (D.N.D. Feb. 22, 2023) (finding that "a silencer is not necessary to make a firearm operable. Rather, a silencer is simply a means to reduce sound omitted from a firearm" and ruling that silencers are not protected by the Second Amendment); *United States v. Hasson*, 2019 WL 4573424, at *2 (D. Md. Sept. 20, 2019) (finding that silencers "generally have no use independent of their attachment to a gun" and "you can't hurt anybody with [one] unless you hit them over the head with it"). In fact, a district court in California was recently presented with the same constitutional arguments Villalobos brings here. In *United States v. Serrano*, that Court found that "26 U.S.C. §§ 5861(d) [] surely falls within the "variety" of gun regulations allowed by the Second Amendment." 2023 WL 2297447, at *14 (S.D. Cal. Jan. 17, 2023). The Court agrees.

Because the second amendment does not explicitly or implicitly protect Villalobos's right to own a silencer, the Court need not reach the historical inquiry. Even if it did, the Supreme Court has, again, already done the leg-work. In *Heller*, it laid out the "historical tradition of prohibiting the carrying of dangerous and unusual weapons" such as silencers. 554 U.S. at 627 (citing Blackstone 148–149 (1769), 3 B. Wilson, *Works of the Honourable James Wilson* 79 (1804); J. Dunlap, *The New–York Justice* 8 (1815); C. Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822); 1 W. Russell, *A Treatise on Crimes and Indictable Misdemeanors* 271–272 (1831); H. Stephen, *Summary of the Criminal Law* 48 (1840); E. Lewis, *An Abridgment of the Criminal Law of the United*

*States* 64 (1847); and F. Wharton, *A Treatise on the Criminal Law of the United States* 726 (1852)). These "histories" are sufficient for the Court today.

Thus, the *Bruen* standard is satisfied because the regulation of silencers is readily analogous to the Nation's history of imposing commercial regulations on firearms—particularly those designated as "unusual or dangerous." Villalobos's Motion to Dismiss Count Ten is DENIED.

## V. CONCLUSION

The arguments presented today have been tried and rejected. Though *Bruen* changed the way Courts evaluate Second Amendment Challenges, it did not alter the law so drastically as to undo prior decisions that rested on the same history being challenged today. Said another way, the history has not changed. The format in which it will be presented to the Court moving forward may look different, but the history itself—and the resulting analysis—is still sound. The Court does not find that Villalobos is part of "The People." But whether he is part of the people or not, § 922(g)(1) remains valid.

The Court is bound by the Ninth Circuit's holding in *Vongxay*. What's more, the Court supports the analysis and findings therein. This Nation may not have had a history of restricting "felons" until the 1900's, but as explained in *Vongxay*, it most assuredly has a history—dating back to the founding—of restricting gun rights to "law-abiding" citizens. *See also, Medina*, 913 F.3d at 159 (explaining that "at least four circuits have endorsed the view that most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens'") (citing *United States v. Yancey*, 621 F.3d 681, 684–85 (7th

Cir. 2010); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010); *Binderup v. Attorney General*, 836 F.3d 336, 348 (3d Cir. 2016); *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012)).

The Court agrees that "the *Bruen* Decision, although ground-breaking, has not altered the historic tradition or constitutionality of denying Second Amendment protection to convicted felons." *Young*, 2022 WL 16829260, at *11.

In like manner, *Bruen* has not changed the fact that silencers are considered "dangerous and unusual weapons" and are not protected (explicitly or implicitly) but the Second Amendment.

Villalobos has not met his burden as to either Count One or Court Ten. The Motions to Dismiss are DENIED.

## VI. ORDER

The Court HEREBY ORDERS:

1. Villalobos's Motion to Dismiss Count One of the Indictment (Dkt. 90) is **DENIED**.

2. Villalobos's Motion to Dismiss Count Ten of the Indictment (Dkt. 91) is **DENIED**.

3. The Court previously "Denied in Part" (Dkt. 103) Villalobos's Motion to Suppress for *Franks* Violation (Dkt. 92). That denial in part left open the possibility that Villalobos might make further argument at the recent hearing. Dkt. 103, at 27 n.16. At the hearing, Villalobos confirmed he would *not* be

making any other argument on that wise. Accordingly, the Motion to Suppress

(Dkt. 92) is denied in full.

DATED: April 21, 2023

David C. Nye
Chief U.S. District Court Judge